OF THE

# STATE OF MISSOURI

AT THE

OCTOBER TERM, 1911.

---

(*Continued from Volume 238*)

---

## MARGARET LIEBER v. ELIZABETH LIEBER, Appellant.

In Banc, December 23, 1911.

1. **WITNESS: Competency: One Party Dead: Divorce Suit.** In substance, section 6354, Revised Statutes 1909, disqualifies any person from testifying as a witness in a cause, regarding any matter involved therein, where the other party thereto is dead or insane. Testimony of a surviving wife, who was a defendant in a divorce suit brought by her husband in Illinois by publication in which he alleged she was a non-resident, touching the cause of action which was there in issue and on trial and adjudicated, namely, her testimony tending to show that she was at that time a resident of Illinois and that her husband had not been for one whole year prior to filing his suit, is not competent in the trial of her suit, brought in this State by her, after his death, to establish homestead in land on which he resided at the time of his death, in which she bases her right to recover on the ground that the divorce decree was invalid. He being dead, she was incompetent to testify in the Missouri suit concerning any such matter in issue, on trial and adjudicated in the Illinois action, since the real question was whether she was his wife at the time of his death.

239 Sup.]                    (1)

2. **JUDGMENT OF ANOTHER STATE:** Impeachment. Judgments and decrees rendered by a court of competent jurisdiction of another State are, under the Constitution of the United States, declaring that "full faith and credit shall be given to the public acts, records and judicial proceedings of every other. State," conclusive as to all questions involved and adjudicated, as much so as if they had been rendered by a court of like jurisdiction in this State; and when they are rendered by a court of general common-law jurisdiction, whether of this or another State, they can be impeached and set aside only (1) for fraud practiced upon the court in the very act of procuring the judgment, or (2) when the defendant was not legally served with process.

3. ————: ————: **Fraud.** The fraud that will authorize a court of equity to set aside or ignore a judgment rendered by a court of competent jurisdiction, whether of this or of another State, must be fraud exercised in the procurement of the judgment, and was, therefore, a fraud upon the court and the other party to the suit; and such fraud must be established by clear, strong and cogent evidence, leaving no room for reasonable doubt.

4. ————: ————: ————: **Perjured Testimony.** Perjured testimony is not such fraud upon the court as authorizes the judgment to be set aside. Testimony that the deceased plaintiff in the divorce suit had stated he had to pay a certain person forty dollars to swear falsely for him in the divorce suit, even if true, is not sufficient to set the divorce decree aside, for even the false swearing did not go to the very procurement of the decree—especially, where the record shows that the testimony was in the form of depositions, and the only witness who testified to the merits was the plaintiff himself, all the others being character witnesses.

5. ————: **Foreign Jurisdiction: Presumption.** Where reliance is placed upon the judgment of a court of another State, the presumption is that such court had authority to render it and that it properly acquired the necessary jurisdiction. The presumption in favor of jurisdiction is the same whether the judgment relied on is a domestic or foreign one.

6. ————: ————: **Proof.** The question of jurisdiction of the foreign court was an issuable fact involved in its judgment, and the finding thereon is just as binding as . is the finding of any other fact. Nor should the Missouri courts require of the courts of a sister State a greater weight of evidence than they demand in a similar case tried in this State.

7. ————: **Collateral Attack.** It is elementary that a judgment rendered by a court having jurisdiction of the parties and the subject-matter is not open to impeachment or contradiction,

Lieber v. Lieber.

in respect to its validity or verity or binding effect upon the parties thereto, in a collateral proceeding. Where a court of Illinois of competent jurisdiction rendered a judgment of divorce in favor of plaintiff's husband, that judgment cannot be attacked or impeached in a suit by her, after his death, to have a deed to his second wife annulled and to have a homestead established in the land in plaintiff's favor, praying that for the establishment of the homestead that judgment be held to be invalid and wrongfully obtained. Even if the judgment for divorce was voidable it could be set aside and for naught held only in a direct attack upon it, instituted for the express purpose of having it annulled.

8. ————: In Rem: Divorce: Decease of Party. A judgment in a divorce case is one *in rem*, and a suit to dissolve it cannot be maintained after one of the parties thereto is dead.

### Per VALLIANT, C. J., dissenting.

1. JUDGMENT: Jurisdiction: Perjured Testimony. When a court of another State has been misled by false testimony as to jurisdictional facts, to take jurisdiction of a proceeding *in rem* (for instance, to take jurisdiction of a suit for divorce on an order of publication based upon an affidavit falsely stating the plaintiff to be a resident), and renders judgment on false testimony, to the injury of a defendant who was not present and who had no actual notice of the suit, the defendant, when afterwards confronted with such judgment in a suit in this State brought to establish her marital property rights, may show, by oral testimony, that the court which rendered such judgment did not have jurisdiction, though it be fair on its face and recites the necessary jurisdictional facts.

2. ————: ————: Court of Another State: Perjured Testimony. There is a difference between a foreign and a domestic judgment. Where a citizen of this State is confronted with the decree or judgment rendered by a court of another State, the question of the jurisdiction of the court rendering the judgment is open to inquiry; and though the judgment recites on its face that the defendant was properly served or appeared, its lack of jurisdiction can be shown by showing, by oral testimony or othewise, that said recitals were false, and that they were based upon perjured testimony.

3. ————: ————: Divorce: In Rem: Non-Resident Plaintiff. A suit for divorce, to which only one party appears and the other party is not served with personal process, but only by publication, is classed as a proceeding *in rem*, though it is not really so, but a classification that is enforced by the law of necessity, which compels the acceptance of notice by publica-

tion to the non-resident defendant as sufficient. The State has the right to declare the marital status of its citizens, but it is the status of the plaintiff in the divorce case that must first be determined before the court has jurisdiction. If the statute of the State require him to be a resident of the State one whole year next prior to the institution of his suit for divorce, unless the injury was committed in the State, the court does not have jurisdiction of the marital status on the mere appearance of the plaintiff and a false recital in his affidavit and a false statement in his deposition to the effect that he has for one whole year next prior to filing his suit been a resident of the State; and the falsity of said affidavit and testimony, where his wife was notified only by publication and did not appear, may be shown by her in a subsequent suit by her in another State to establish her marital right to his property.

4. **HOMESTEAD: Conveyance by Husband Alone: In Fraud of Wife.** Conceding that a husband could, after 1895, mortgage or convey a homestead acquired prior to the enactment of the statute of 1895, without his wife joining therein, yet that means that he may sell or mortgage it in good faith, and does not mean that he may make a fraudulent sale for the purpose of depriving his widow of her homestead right therein.

### Per KENNISH, J., dissenting.

1. **WITNESS: Competency: Other Party to Divorce Suit Being Dead.** If the deposition or testimony of the plaintiff upon which the decree in the divorce suit was based is read or produced at the trial of the case at bar, such plaintiff being now dead, the other party to that suit can testify to the same facts, namely, the jurisdictional facts that go to show that the court which rendered the divorce decree was without jurisdiction of the cause.

2. **JUDGMENT: Collateral Attack: Jurisdiction.** A judgment of another State may be attacked collaterally because void for want of jurisdiction in the court that rendered it. Jurisdictional facts stand on an entirely different footing from facts that constitute a cause of action and upon which the prayer for relief was based. As to the latter class of facts, fraud or even perjury cannot be made the basis of a collateral attack, whether the judgment was rendered by a domestic or a foreign court; but the facts upon which the jurisdiction of the foreign court depended may always be inquired into. For instance, where the statute of Illinois required a plaintiff in a divorce suit to reside one whole year in that State next prior to filing his petition for divorce, a residence for that length of time was jurisdictional, and in a subsequent trial of a suit in this State involving the marital property-rights of the defendant in that, it is competent to permit an inquiry into that jurisdic-

tional fact, and if the evidence clearly shows that the affidavit and decree asserting such residence was false, the court should hold that the judgment of the Illinois court granting to plaintiff a divorce was, as to defendant's marital property-rights in this State, void and of no effect.

3. ———: **Divorce: Obtained by Fraud: Plaintiff Dead.** A judgment in a suit for divorce, obtained in a court of another State, upon false testimony as to jurisdictional facts, is subject to direct and collateral attack, even though the proceeding be *in rem*, and the plaintiff therein be dead. Where the marital property-rights of the defendant in that case come up for adjudication in a .court of this State, the court may determine, upon oral testimony, that the court of the other State had no jurisdiction of the divorce case, that the recitals of the record asserting the necessary jurisdictional facts were false, and that, as to the marital property-rights of the defendant wife therein, the judgment was void and of no effect.

Appeal from Hickory Circuit Court.—*Hon. Argus Cox,* Judge.

Reversed.

*Henry P. Lay, J. W. Montgomery* and *W. D. Harryman* for appellant.

(1) The plaintiff was not a competent witness as to any facts relating to the Illinois decree of divorce, the other party to the cause of action being dead. R. S. 1909, sec. 6354; Bishop v. Investment Co., 129 S. W. (Mo.) 668; Patton v. Fox, 169 Mo. 97. (2) Judgments of foreign courts are conclusive in Missouri as to all questions involved therein. 13 Am. and Eng. Ency. Law (2 Ed.), 977; Wilson v. Jackson, 10 Mo. 329; Barney v. White, 46 Mo. 137; Harbin v. Chiles, 20 Mo. 314; Randolph v. Keiler, 21 Mo. 557; Blackburn v. Jackson, 26 Mo. 308; Napton v. Leaton, 71 Mo. 358. (3) And this has been especially held as to decrees of divorce. Anthony v. Rice, 110 Mo. 223; Gould v. Crow, 57 Mo. 200. (4) A judgment, fair on its face, cannot be attacked in a collateral proceeding. A collateral attack is an attempt to impeach

a judgment in a proceeding not instituted for the express purpose of annulling such judgment. 17 Am. and Eng. Ency. Law (2 Ed.), 848; Lovitt v. Russell, 138 Mo. 474; Truesdale v. McCormick, 126 Mo. 39; Wise v. Loring, 54 Mo. App. 258. (5) While it is true that in a direct proceeding (which this is not) a court of equity will grant relief against a judgment procured by fraud, yet the fraud to justify such relief, must be shown by the clearest evidence, and must be in the very procurement of the judgment and must be a fraud upon the court as well as upon the other party. 16 Am. and Eng. Ency. Law (2 Ed.), 380; Hamilton v. McLean, 139 Mo. 678; Hamilton v. McLean, 169 Mo. 51; Murphy v. De France, 101 Mo. 151; Frears v. Riley, 148 Mo. 49; Railroad v. Mirrielees, 182 Mo. 126; Irvine v. Leyh, 124 Mo. 361; Payne v. O'Shea, 84 Mo. 129; Crim v. Crim, 162 Mo. 544; Bates v. Hamilton, 144 Mo. 1; Moody v. Peyton, 135 Mo. 482. It is not sufficient that the original cause of action is vitiated by fraud, or that the judgment was the result of perjured testimony. Cases above cited. The finding of the Illinois court that Alexander Lieber was a resident of that State is final, and cannot be inquired into in this proceeding. 13 Am. and Eng. Ency. Law (2 Ed.), 995, n. 1; Frears v. Riley, 148 Mo. 49. (6) As Alexander Lieber acquired his homestead prior to the amendment of 1895, and the plaintiff had filed no claim of homestead, his conveyance of his homestead was valid, even though she had been his wife. His right to convey was a vested right, and was not affected by the amendment of 1895. Gladney v. Sydnor, 172 Mo. 318. (7) It appearing from plaintiff's petition and proof that the decree of divorce was rendered in 1868; that she had actual knowledge of the decree at least fifteen years before the death of Alexander Lieber and actually lived on adjoining farms for some years before his death, but made no complaint, there is no equity

in her petition and it should be dismissed. Buffington v. Carty, 195 Mo. 499. And these facts appearing from plaintiff's own petition and evidence it was not necessary for defendant to plead laches. Quinlan v. Keiser, 66 Mo. 603.

*Rechow & Pufahl, W. L. Pitts, F. M. Wilson* and *W. A. Dollarhide* for respondent.

(1). The plaintiff was a competent witness. White v. Maxey, 64 Mo. 560; Spradling v. Conway, 51 Mo. 54; Garvin's Admr. v. Williams, 50 Mo. 206; Hoyt v. Davis, 30 Mo. App. 309; Green v. Green, 126 Mo. 25. (2) Oral testimony is admissible to impeach a judgment alleged to have been obtained by fraud in its procurement on jurisdictional facts. Rosencranz v. Dry Goods Co., 175 Mo. 538; Mullins v. Reiger, 169 Mo. 532; Wonderly v. Lafayette Co., 150 Mo. 635; Mayberry v. McClurg, 51 Mo. 556; Link v. Link, 48 Mo. App. 345; Ramsey v. Hicks, 53 Mo. App. 190; Fitzpatrick v. Stevens, 114 Mo. App. 497; Hinkle v. Lovelace, 204 Mo. 208; Howard v. Scott, 225 Mo. 713; Thompson v. Whitman, 85 U. S. 457; Streitwolf v. Streitwolf, 181 U. S. 179; Bell v. Bell, 181 U. S. 175; Wood v. Wood, 12 L. R. A. (N. S.) 891; Lawrence v. Nelson, 113 Iowa 277; Johnson v. Coleman, 23 Wis. 452; Bomsta v. Johnson, 38 Minn. 230; Rawlins v. Rawlins, 18 Fla. 345; McCraney v. McCraney, 5 Iowa 232; Brown v. Grove, 116 Ind. 84; Succession of Benton, 59 L. R. A. 183; State v. Westmoreland, 8 L. R. A. (N. S.) 842; Marx v. Force, 51 Mo. 69. (3) The deed from Alexander Leiber having been made without consideration and to defraud this plaintiff was and is void as to her. Rice v. Waddell, 116 Mo. 99. Even if it was not, still this plaintiff had dower in the premises and ejectment lies for its recovery when she is deforced. (4) When a charge of fraud is made against a person and that person does not testify, this

is a very strong circumstance of the truth of the allegation. Mabary v. McClury, 74 Mo. 575; Eck v. Hatcher, 58 Mo. 238; Leeper v. Bates, 85 Mo. 228; Bent v. Lewis, 88 Mo. 470; Nelson v. Hall, 104 Mo. App. 473; Baldwin v. Whitcomb, 71 Mo. 651. (5) As the petition for divorce charges the desertion just eight days before the filing of the same, to-wit, on the 20th of July, 1868, the same failed to state facts sufficient to give the Illinois court jurisdiction. (6) The Statute of Limitations was not pleaded, nor are any laches pleaded. Tramwell v. Adam, 2 Mo. 155; Benoist v. Darby, 12 Mo. 176; Orr v. Rove, 101 Mo. 387; Stoddard v. Malom, 115 Mo. 508; Bell v. Clark, 30 Mo. App. 224; Maddox v. Duncan, 62 Mo. App. 474; Bavy v. Levee Dist., 110 Mo. App. 599; Stevenson v. Smith, 156 Mo. 447; Vogul v. Kennedy, 127 Mo. App. 228. In certain cases it may be raised by special demurrer. State ex rel. v. Spencer, 79 Mo. 314; Maddox v. Duncan, 62 Mo. App. 464. It cannot be raised for the first time in the Supreme Court. Wyman v. Cary, 48 Mo. 346; Price v. Haeburly, 25 Mo. App. 206. (8) When there is fraud perpetrated in the very acts to give the court an apparent jurisdiction in a case, this is held by all courts to comply with the rule that requires the evidence to show that fraud was perpetrated in the procurement of the judgment. See authorities cited under point two.

WOODSON, J.—The plaintiff instituted this suit in the circuit court of Hickory county, against the defendant, to set aside and have cancelled a certain deed made and delivered February 7, 1905, by one Alexander Lieber, now deceased, to the defendant, Elizabeth Lieber, conveying to her certain real estate, fully described in the petition, and located in said county, for the alleged reason as stated in the petition, that said land was the homestead of said Alexander Lieber, and that she, the plaintiff, did not join in the conveyance;

she also alleging that she, at the date of the convey-
ance, was his lawful wife, and at the institution of the
suit she was his widow.

The petition also charges that a decree of divorce
granted by the circuit court of Mercer county, Illi-
nois, in the year 1868, in favor of said Alexander Lie-
ber against her, was procured by fraud, and that there-
after, on October 25, 1868, he was married to Eliza-
beth Lieber, the defendant.

The petition, in addition to asking to have the
deed of conveyance set aside and cancelled, incident-
ally seeks to have the decree of divorce granted
Alexander Lieber against the plaintiff here, the de-
fendant then, also set aside in so far as it affects the
real estate in controversy.

The answer put in issue all allegations of the peti-
tion, and the parties went to trial without question-
ing the sufficiency of the pleadings.

The decree was for plaintiff as prayed, and after
moving unsuccessfully for a new trial, the defendant
appealed the cause to this court.

The following facts seem to be undisputed, viz.:

During the year 1857, the plaintiff, Margaret Lie-
ber, and Alexander Lieber were lawfully married in
the city of St. Joseph, Missouri, and lived together
as husband and wife, in this State, until the latter
part of the year 1865 or the first of 1866; that they
then went to Quincy, Illinois, where they separated;
that on October 9, 1868, Alexander Lieber secured a
decree of divorce in the circuit court of Mercer
county, Illinois, against Margaret Lieber, the pres-
ent plaintiff, on the ground of desertion, based upon
publication, regularly had, against her as a non-resi-
dent; that thereafter, on October 25, 1868, Alexander
Lieber married the defendant Elizabeth Lieber; that
in 1884 he acquired the land in controversy, and con-
tinued to occupy it as a homestead up to the time of
his death; that prior to his death, in 1905, he, for a

good, as distinguished from a valuable, consideration, conveyed the land to the defendant, but he and the defendant continued to live on eighty acres of it until his death on February 13, 1907; that the plaintiff knew, for a period of fifteen years prior to bringing this suit, that Alexander Lieber had obtained the decree of divorce from her, and for two years or more prior to his death she lived within a mile of the residence of said Alexander Lieber and the defendant, but took no action whatever to avoid said decree of divorce, or to assert any claim against the said Alexander Lieber, until seven days after his death, on which date she brought this suit.

Counsel for plaintiff offered and the court admitted over the objections of the defendant, the testimony of the plaintiff to the effect that she was and had been for many years a resident of the State of Illinois prior to the time the order of publication was issued and published, notifying her of the bringing of said divorce suit, on the ground of non-residence.

Counsel for plaintiff also offered, and the court admitted over the objections of the defendant, the testimony of Ben and Ed Lieber, the sons of Alexander Lieber and the plaintiff by the first marriage.

At the time of their parents' separation, Ben was only five years of age, and Ed could not have been over seven. Their testimony was to the effect, that Alexander Lieber had not been a resident of the State of Illinois for one year immediately prior to the institution of this suit for divorce from his wife; that after the plaintiff and their father separated in Quincy, Illinois, he took the children, including Ben and Ed, and Elizabeth Dietz, the defendant, and wandered around for a short time in that State, and then went to Warsaw, Illinois, where he made his residence for a period of two years; that about this time, he took another trip through Missouri, remaining some three or four months at Perry, and became a resident thereof; that

he then renewed his travels over other States, lasting several weeks, after which he returned to Mercer county, Illinois, where the suit for divorce was brought, and the decree rendered.

They also testified in effect that they heard Alexander Lieber state upon one occasion that he had paid some man forty dollars to swear falsely for him in the divorce case; however, the proceedings had in the divorce case, which were introduced in evidence in this case, show Alexander Lieber himself was the only material witness who testified in his own behalf.

These two sons also testified to a great mass of matters tending to show that Margaret Lieber, the defendant in the divorce proceedings, and not Alexander Lieber, the plaintiff therein, was the innocent and injured party, but none of this testimony tended to show fraud on the part of the latter in the procurement of the decree for divorce.

The defendant in the case at bar, Elizabeth Lieber, as previously stated, objected to the testimony of the plaintiff herein, Margaret Lieber, for the reason that it related to the cause of action which was in issue, on trial, and decided in the divorce case of Alexander Lieber against her, he being dead, section 6354, Revised Statutes 1909 disqualified her as a witness.

The defendant also objected to the introduction of the testimony of the plaintiff in this case, as well as that of her two sons, Ben and Ed, for the reason that the decree of divorce rendered by the circuit court of Mercer county, Illinois, divorcing Alexander Lieber from Margaret Lieber, which is fair and regular on its face, cannot be attacked in this collateral manner.

The defendant, in the case at bar, in order to sustain her defense, introduced in evidence the decree of divorce, which is fair upon its face, together with a full transcript of the proceedings, duly authenticated under the acts of Congress, which was rendered, entered and had in the circuit court of said Mercer

county, divorcing Alexander Lieber from Margaret Lieber.

Besides the finding and decree of the circuit court of Mercer county that Alexander Lieber was a resident of the State of Illinois for a period of one year prior to the institution of the divorce suit, there is contained in the voluminous record of this one-sided trial (one-sided, because of the death of Alexander Lieber) some additional evidence tending to show that he was a *bona fide* resident of Illinois.

I. The first proposition presented by this record for the court's determination is the ruling of the trial court admitting in evidence the testimony of Margaret Lieber, the plaintiff in the case at bar, who was the defendant in the divorce proceedings of Alexander Lieber, had against her in the circuit court of Mercer county, Illinois, touching the cause of action, which was there in issue, on trial and adjudicated, and since which time Alexander Lieber, the other party to that cause of action, having died.

In substance, section 6354, Revised Statutes 1909, disqualifies any person from testifying as a witness in a cause, regarding any matter involved therein, when the other party thereto is dead or insane.

The wisdom and justice of this statute at once suggests itself to all fair-minded persons, namely, that when death or insanity has closed the lips of one of the parties to the contract, or cause of action, in issue and on trial, then the law should hold mute the tongue of the other.

At an early day, this court, in the case of Bradley v. West, 68 Mo. 69, erroneously held that when one party to a contract was dead, and that subsequently thereto, when said contract became involved in a cause of action, in issue and on trial, between the surviving party thereto and a stranger, the statute mentioned did not prohibit the survivor from testifying regarding the contract as against the stranger. In other

words, that case held that this statute did not prohibit the grantee Bradley, in a deed of conveyance, from testifying in a suit in ejectment brought by him against West, a stranger, as to the validity of that deed, through which, he, the plaintiff, deraigned title, notwithstanding the fact that Horton, the grantee in the deed, was dead.

Shortly after the delivery of the opinion in the case of Bradley v. West, supra, the same question there decided, again came before this court in the case of Chapman v. Dougherty, 87 Mo. 617. In this case the injustice and error of the former ruling was pointed out, and we there, in express terms, overruled the case of Bradley v. West, and correctly held that the disability imposed by this statute upon a witness who is one of the original parties to a contract or cause of action, in issue and on trial, where the other party thereto is dead, and the survivor is a party to the suit, is coextensive with every occasion where such instrument or cause of action may be called in question.

Because of the known and recognized ability and great legal learning of the distinguished jurist who wrote the latter opinion, and who honored this court as a member thereof for thirty years, I feel fully justified in quoting therefrom his clear, terse and able remarks bearing upon this question. After stating the case, and showing what the contract or cause of action was, which was then in issue and on trial, he said:

"All these things were put in issue and necessarily involved therein; and the defendant was one of the original parties to the contract or deed which evidenced the title whereon plaintiffs relied, without which their title could not be established or maintained, and the other party to that contract was dead; that contract or deed was thus necessarily in issue, constituting as it did the highest evidence of ownership, and consequently the most material fact which went to make up plaintiffs' cause of action; that cause

of action was in issue and on trial, and without proof of the validity of that deed in consequence of a delivery thereof, plaintiffs had no standing in court. The importance of the defendant's testimony, denying, as it did, the validity of the deed by reason of the fact, to which he testified, that it had never been delivered, is, therefore, most obvious; since that testimony struck at the very foundation of plaintiffs' cause of action. Was his testimony admissible? 'The reason of the statutory prohibition is the prevention of one person testifying where death has sealed the lips of his adversary.' [Fulkerson v. Thornton, 68 Mo. 468.] Wharton, when speaking of similar statutory prohibitions, says: 'The reason of this exception is, that when there is no mutuality there should not be admissibility; i. e., when the lips of one party to a contract are closed by death, then the other party should not be heard as a witness. . . . Much, however, as the statutes may differ in words, they are the same in purpose. That purpose is to provide that when one of the parties to a litigated obligation is silenced by death, the others shall be silenced by law.' [1 Whart. on Ev., sec. 466.]

"And this view has been reiterated by this court in various forms. Thus, WAGNER, Judge, says: 'The object and purpose of the statute was undoubtedly to put the two parties to a suit upon terms of substantial equality in regard to the opportunity of giving testimony. The proposition may be taken as a general one, therefore, that where parties have contracted with each other, each may be supposed to have an equal knowledge of the transaction, and both, if living and sane, are allowed to testify. But if one is precluded by death or insanity, the other is not entitled to the undue advantage of being a witness in his own case.' [Looker v. Davis, 47 Mo. 140.] And in Stanton v. Ryan, 41 Mo. 510, where surviving partners brought an action upon a *quantum meruit,* and the defendant

set up as a defense a special contract with the deceased partner, the remaining partners were permitted to testify touching the facts constituting their cause of action, and so also was the defendant; but he was not permitted to testify respecting the special contract, which, if enforced, would, it seems, have defeated the action of the plaintiffs; and this ruling was affirmed by this court, WAGNER, Judge, remarking: 'The suit was not instituted on the contract; it was denied that any contract existed; the surviving plaintiffs knew nothing about it; and to permit Ryan, by his own testimony, to come in and set up, and prove its terms, when Stanton's lips were sealed by death and could not be there to contradict, qualify or explain his statements, is at war with justice, and certainly not authorized by law.'

"In Vermont, a State possessing statutory provisions identical with our own, the grantee of the heirs of an intestate through the administrator of the estate, brought ejectment against the defendant, who had held the land sued for prior to the death of the intestate. The plaintiff claimed this possession was not adverse; the defendant claimed the contrary, and he was admitted by the lower court to testify in support of his claim; but this ruling was reversed by the Supreme Court. PIERPONT, C. J., after quoting the statute, among other things, said: 'The court below seems to have proceeded upon the ground that the beneficial operation of this statute is to be limited to cases where the estate or the legal representatives of the deceased party are in interest. The statute does not in terms so limit it. . . . The suit is brought in the name of the administrator to establish the title of the deceased party, for the benefit of the grantee of the heirs to the estate. Is there any reason why the benefit of this statute should be given to the heirs of the estate, and denied to their grantee, the action being in the same form? The object of the statute was

to guard against the danger of false testimony by the survivor. The danger is just as great in one case as in the other. The grantee or assignee of the deceased party, or his representatives, is not supposed to know any more of the nature of the transaction between the original parties than do the heirs or administrator of the deceased party. Ordinarily he knows less. The rights of the assignee are just as sacred in the eye of the law, as the rights of the heirs. The protection of the statute is just as necessary in one case as in the other, and no evil can result from its application in one case that will not follow its application in the other. . . . The statute makes the death of one party to the cause of action in issue the ground of excluding the survivor, and not the fact that the estate of the deceased party has an interest in the result of the suit.' [Hollister v. Young, 41 Vt. 157. The doctrine of this case was afterwards affirmed in the case of Insurance Co. v. Wells, 53 Vt. 14, in which all the prior cases in that State on the point were commented on, inclusive of that of Bank v. Schofield, 39 Vt. 590, in which the opinion of the court was also delivered by PIERPONT, C. J.]

"It will readily be observed that Hollister's case, supra, fully sustains the position heretofore taken as to what constitutes, in ejectment suits, the cause of action in issue and on trial; and the inadmissibility of a party thereto, his adversary being dead, to testify in the action. This court, on several occasions, has made similar rulings where the title to land in one form or another, was in issue. Thus, in Martin v. Jones, 59 Mo. 181, where one McCarty had sold and conveyed land to one Williams, and afterwards conveyed the same by deed of trust to Jones as trustee for Austin, and both Jones and Austin had notice of the former deed, and the heirs and representatives of Williams filed their petition to cancel the deed of trust, and to enjoin a sale thereunder, and the answer denied the execution of the deed to Williams, and the fact of

notice, it was held by this court that McCarty was in-
competent as a witness to controvert by his testimony
his deed to Williams; VORIES, J., remarking: 'Whether
either of the matters in issue, as above set forth, could
be called the contract or cause of action in issue and
on trial, within the meaning of the statute, is difficult
to determine; but if the object in introducing the de-
fendant McCarty as a witness was to .elicit evidence
from him, the tendency of which would be to affect or
invalidate the deed from him to Williams, he would
most certainly be incompetent for that purpose, as
the other party to that contract was dead.' So, also,
in Poe v. Domic, 54 Mo. 119, where a suit was brought
to set aside, and adjudge null, a deed made by Poe to
his codefendant, it was ruled that Poe was incompe-
tent as a witness in respect to the execution of such
deed. And in Sitton v. Shipp, 65 Mo. 297, it was ruled
in a proceeding for specific performance, that a plain-
tiff witness, where the other party to the contract was
dead, was incompetent to prove either the contract it-
self or acts of part performance thereunder.

"In quite a recent case, that of Hughes v. Israel,
73 Mo. 538, it was ruled in an action of ejectment
where the plaintiff claimed under a deed from defend-
ant to his son, since deceased, and defendant claimed
under a verbal contract, that defendant was not a
competent witness to prove such contract. In that
case, as in this, it was contended that the cause of ac-
tion in issue and on trial was the unlawful withhold-
ing by the defendant of the possession of the prem-
ises from the plaintiff; and that as both the parties to
the controversy were living, and parties to the suit,
defendant was, therefore, competent as a witness to
any fact in the suit. The scope of the issues on trial
was not, however, passed upon, but the intimation was
strongly given that if the answer had been simply a·
general denial, that then the position as to the com-

petency of the defendant as a witness, would have
been tenable. To this intimation I cannot yield my as-
sent; for I must confess my inability to discover how
parties to a legal controversy can so mould their
pleadings as to confer competency on a witness where
the law not only fails to bestow it, but more than that,
positively declares his absolute incompetency.

"If I am correct in my views, heretofore ex-
pressed, as to the scope of the issues in an ejectment
suit; as to its embracing within its issues the title, and
all that such term implies, then it follows that defend-
ant was incompetent as a witness to overthrow by his
testimony any instrument to which he was one of the
original parties, such instrument being the muniment
of title on which the plaintiffs rely. Any other doc-
trine than the one here asserted, would place it in the
power of every grantor in an action of ejectment
where the grantee is dead, to overthrow by his oath
his most solemnly executed conveyance on the specious
plea that such instrument was not embraced within the
issues of such a suit. The defendant in this case con-
fidently relies on Bradley v. West, 68 Mo. 69, as sus-
taining his position as to the narrow scope embraced
in the issues of an action of ejectment; and that meas-
ured by the standard of that case, defendant was a
competent witness. In that case, the grantee in the
deed was permitted to testify to facts which gave val-
idity to the very deed under which he claimed, the
grantor therein being dead. It is true, in that case,
the defendant was a stranger to the deed, but I am
not able to see any distinction between a case of that
character, and one where the heirs of either the grant-
or or grantee are parties to the litigation. The stat-
ute certainly makes no such distinction; the disability
of one of the original parties to the contract or cause
of action in issue and on trial, where the other party
is dead, and the survivor is a party to the suit, is co-
extensive with every occasion where such instrument

or cause of action may be called in question; at least the statute lays down but the one rule, and that should be the guide. All the dangers and all the mischief which can arise from the false testimony of the surviving party, will be incurred as well in the case where the heirs of the deceased party bring suit, and rely on the contract, etc., as when a stranger does the like. Hollister's case, supra.

"Indeed, the rule in Bradley v. West, tends to render the titles of heirs unmarketable in their hands; for under that rule, so soon as they convey to a stranger, he must needs run the gauntlet of anticipatory perjury, and take the risk of seeing any link in his chain of title swept away by the bare oath of some dissatisfied party whom he may find it necessary to sue, or whose good pleasure it is, mayhap, to sue him.

"For these reasons, I am of opinion that the rule laid down in that case is not law; should no longer be followed, and that the judgment of the lower court should be reversed, and the cause remanded, with directions to proceed conformably to this opinion. All concur."

The same question came before this court again in the case of Meier v. Thieman, 90 Mo. 433. The facts of this case materially differ from those of the two former only in that Adolphus Meier, the real party in interest, was not a party to the record, while Alwind Meier, the party to the record, was only nominally interested in the subject-matter of litigation. In discussing this question the same distinguished jurist used this language:

"II. There is but one other question presented by the record worthy of examination and that is the competency of Adolphus Meier as a witness in the cause. Section 4010, after removing common-law restrictions prohibiting witnesses from testifying, contains this proviso: 'Provided, that in actions where

one of the original parties to the contract or cause of action in issue and on trial is dead, . . . the other party shall not be permitted to testify in his own favor.' What is meant in this clause by the words 'the other party?' I think it is very clear that they refer, and can only refer, to the other party to the original contract or cause of action. This is certainly required by the grammatical construction of the sentence, and certainly such a construction would be most natural and obvious. This view of the proviso has been twice taken by this court. Thus in Ring v. Jamison, 66 Mo. 424, HENRY, J., speaking for the court, said: 'In Angell v. Hester, 64 Mo. 142, this court said: ''We take the true distinction to be, that where one of the original parties to the contract or cause of action in issue and on trial is dead, the other party to such contract or cause of action will not be permitted to testify to any fact which he would not have been permitted to testify to at common law; that where one of the parties is dead, the other party stands, in regard to testifying, precisely as if the statute allowing persons to testify (parties was intended) had not been enacted.'' The statute is in derogation of common law. If both parties to the contract or cause of action, are alive, they can testify as other witnesses, . . . but not so if one be dead. The substance of the provision is, that if both parties are alive, both may testify, but if one be dead, then the common law is in full force as to the competency of the survivor as a witness in his own favor.'

''The statute contains no intimation that the 'other party' referred to is necessarily a party to the record. The language of the statute is 'the other party,' i. e., the other original party to the contract or cause of action shall not be admitted to testify in his own favor, where death has precluded the other original party from an equal opportunity. Whether party to the record or not, makes no difference as to

the statutory incompetency of the witness; he is pro-
hibited from testifying in his own favor in any case
whatsoever where the other original party to the con-
tract or cause of action in issue and on trial is dead.
The letter of the statute makes no distinction as to
the *status* of the witness on the record; the rule of his
exclusion is as broad as the contract or cause of action
in issue and on trial, and his testimony in his own fa-
vor.   And the reason, policy and spirit of the rule
keeps pace with its letter.   This is tersely stated by
Wharton: 'The reason of this exception is, that where
there is no mutuality there should not be admissibility,
i. e., when the lips of one party to a contract are closed
by death, then the other party should not be heard as
a witness. . . .   Much, however, as the statutes
may differ in words, they are the same in purpose.
That purpose is to provide that when one of the par-
ties to a litigated obligation is silenced by death, the
others shall be silenced by law.' [1 Whart. Ev., sec.
466.]

"In this case the cause of action in issue and on
trial was:   Who was entitled to the possession of the
premises and the rents arising therefrom?   It is easy
to see, therefore, that Adolphus Meier was testifying
as much in his own favor, and was as much a gainer
by the result, as if he had been nominally as well as
really a party to the record.   He, in truth, was the
only real party in interest; for it was a matter of no
concern to the defendant tenant to whom he paid the
rent, or whom he acknowledged for his landlord.   If
suit had been brought by the heirs of Thomas J. Meier
against Adolphus Meier for possession of the land,
he certainly would not, under the recent ruling in
Chapman v. Dougherty, 87 Mo. 617, have been per-
mitted to testify in his own behalf, as he was permitted
to do in the case at bar, and the same rule should
apply in the one case as in the other.   The rules of
evidence should not, like the color of the chameleon,

change because of their fortuitous surroundings. In a word, if Adolphus Meier is forbidden to testify in his own favor where he is a party to the record, he should be equally forbidden to testify, though not a party to the record, when the results of his testimony in his own favor would be equally beneficial to him as if he were such party. 'The reason of the law is the life of the law.'

"III. Again, as Adolphus Meier was interested in the event of the suit, as he would have been liable over to the defendant tenant for whatever sum the latter had paid him as landlord, in the event that the plaintiff had recovered in this action, he was incompetent as a witness at common law. [1 Greenl. Ev., secs. 392, 386, 390.] And under the rule laid down in Angell v. Hester, and Ring v. Jamison, supra, he was, for that reason, incompetent to testify in the present instance."

These cases have been approved in express terms in scores of opinions delivered by this court. Among the later are Weiermueller v. Scullin, 203 Mo. 466, l. c. 472; Bishop v. Brittain Investment Co., 229 Mo. 699.

I find no case in which this question has been more ably and clearly treated than has been done in the case last cited. In that case the plaintiff brought the suit for the admeasurement of dower, in lands belonging to the defendant company, which it purchased from Dr. Golin E. Bishop during his life. Plaintiff claimed that she was his common wife, and after his death she brought that suit. One of the contested questions was the marriage. She claimed that there was a common-law marriage, and the defendant denied it. The plaintiff was offered as a witness in her own behalf, for the purpose of proving the marriage, whereupon counsel for the defendant objected to her testifying for the reason that Dr. Bishop, the other party to the alleged contract of marriage, which was in issue and

on trial, in the suit for dower, was dead, and therefore section 4652, Revised Statutes 1899, the same as 6354, Revised Statutes 1909, disqualified her as a witness. That objection was sustained and was assigned here as error. This court, in speaking through LAMM, J., on page 721, said:

"II. Was plaintiff a competent witness? The suit was in form to admeasure dower. The gist of the essential averments of the petition were: (1) marriage, (2) seisin, (3) death, (4) dower—the latter a sequence of the three former (Vide, R. S. 1899, sec. 2933). Such was the rule at common law and such it is in this State. I have read that Robert Toombs, appearing for a widow deforced of her dower, arose at the bar of the Supreme Court of Georgia and condensed his whole argument into the oracular and exclamatory utterance: 'Marriage! Seisin! Death! Dower!' In our case seisin of an estate of inheritance and death are admitted. Marriage is claimed some months before the deed of trust (the root of defendant's title) was executed. Marriage as of that date was disputed. It resulted that marriage or no marriage before the execution of the deed of trust was the sole issue below. A contract to marry and a performance of that contract are asserted by the lady. Her case stands or falls only as she proves or fails to prove those two vital facts. To prove the contract and performance she took up the cudgels in her own behalf by going on the stand. Obviously her testimony was material. To use the favorite expression of Lord KENYON: 'It hit the bird in the eye,' provided she was competent to testify. The question is anxious and rests on statute law.

"Section 4652, Revised Statutes 1899, ordains, *inter alia*, that: 'In actions where one of the original parties to the contract or cause of action in issue and on trial is dead . . . the other party to such con-

tract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him, and no party to such suit or proceeding whose right of action or defense is derived to him from one who is, or if living would be, subject to the foregoing disqualification, shall be admitted to testify in his own favor.'

"We have often construed that section. Its general language breeds difficulty in applying it to the varying phases of litigation, and, it would seem, we have not always been able to hold a steady and uniform voice in applying it. There may be wrinkles in the statute not yet erased by the smoothing iron of justice, for there is an intense human factor in its practical application appealing to different judges in a different way.

"The broad objects of the statute are: first, equality; second, to close the door to false swearing. To further that end we have assumed the reason of the statutory rule to be as laid down by Dr. Wharton, viz., 'That when the lips of one party to a contract are closed by death then the other party should not be heard as a witness.' [Chapman v. Dougherty, 87 Mo. l. c. 621.] The purpose running through all such statutes 'is to provide that when one of the parties to a litigated obligation is silenced by death, the other shall be silenced by law.' [1 Whart. on Ev., sec. 466.] In applying the statutes it has been ruled that where, as in ejectment, the issue was title and one of the parties to a deed necessary to establish it was dead, the living party could not testify in denial of the validity of the deed (Chapman v. Dougherty, supra); nor to sustain a contract, which, if established, would defeat ejectment (Hughes v. Israel, 73 Mo. 538); nor to establish in ejectment the contents of a lost deed (Messimer v. McCray, 113 Mo. 382); nor to establish the contract in a suit for specific performance (Teats v. Flanders, 118 Mo. 660); nor to acts of performance (Sitton v.

Shipp, 65 Mo. 297); nor to reform a contract by supplying a term omitted by mistake, accident or oversight (Smith v. Smith, 201 Mo. 533).

"In interpreting the statute, exceeding care should be taken to steadily apply the main and golden rule of construction, viz., that not only the words but the spirit and purpose of the law should be kept in view, so that the mischief struck at should be retarded, on one hand, and the remedy contemplated should be advanced, on the other.

"Observe, the statutory rule is one of evidence, hence the form of the action in which the rule is invoked is of no consequence in determining whether the rule is applicable. So, while the form of this action is dower, yet dower hinges on a contract of matrimony and its performance. As said, that was the issue tried. Matrimony was 'the contract . . . in issue and on trial. At bottom it was the very cause of action in issue and on trial.' Therefore, the mischiefs under the ban of the statute gave birth to a situation to be narrowly eyed. That situation vehemently calls for the statutory interdiction. This, because the danger of perjury in this character of case is enhanced by a combination of powerful impulses, viz., to cleanse her social status from a scarlet stain of sexual impurity, and, with the same stroke, line her pockets. Prestige! Money! The love of both—master passions of the human breast—in full cry. His legs go far and fast, who is running to a goal of gain and honor. Not only so, but, Bishop being dead, the danger of exposure in false swearing is reduced to a minimum and may invite the hazard of the experiment.

"Speaking of such a contract, ALVEY, J., in Denison v. Denison, 35 Md. l. c. 381, used language meeting our unqualified approval, viz.: 'These loose and irregular contracts, as a general thing, derive no support from morals or religion, but are most generally founded in wanton and licentious cohabitation.'

"The case, then, does not persuade us to stickle on words or stick in the bark in applying the statute. The rather we are inclined to consider it a typical one in which to apply the statute with rigid vigor.

"Referring to an Illinois law, having the same purpose as our own, the Supreme Court of that State, through Mr. Justice SCOTT, In re Estate of Mark H. Maher, 210 Ill. l. c. 170, said: 'This petitioner seeks to swear that she is heir, and thereby establish the relation which, when not conceded, must be established by the judgment or decree of a court before she can testify. If she is competent, then any woman with whom a man has illicitly and openly lived and cohabited, both being then unmarried, has it in her power, after his death, to establish the fact that she is his widow by testifying that a contract of marriage was entered into by him with her when they were alone, in pursuance of which the cohabitation occurred, for none can deny her. It is precisely such an evil that the Legislature intended to prevent by the enactment of section 2 of the chapter on evidence.'

"The question has received consideration by our courts of appeal. [Imboden v. Trust Co., 111 Mo. App. 220; Collard v. Burch, 138 Mo. App. 94.] Our learned brethren of both those benches with one accord agree that the statute applies to a case in which the marriage was disputed and its existence was the very *lis mota.* [See, also, Hopkins v. Bowers, 111 N. C. 175; Sorensen v. Sorensen, 56 Neb. 729; Shorten v. Judd, 56 Kan. 43.]

"We are not confronted with a contrary ruling in any case decided by us in which the point was held in judgment. Cases may be found in which the alleged widow testified without objection. They are, of course, without authority. There are others in which the marriage was not disputed and was not the issue on trial, where the widow was permitted to testify to the fact of marriage. That is a mere rule of conven-

ience to avoid cumbering the record on non-controverted and collateral matter. Such case, on principle, differs vastly from the case at bar.

"Defendant's objection to the competency of plaintiff as a witness should have been sustained."

In the case at bar, the plaintiff's right to a homestead in the lands of Alexander Lieber, depends just as much upon the existence of the marital relation between her and him, at the date of his death, as did Mrs. Bishop's right to dower in the lands of the Investment Company "hinge on a contract of matrimony and its performance" with Dr. Bishop. And as was there said by Judge LAMM, "that was the issue tried;" and here, the question tried is, was Margaret Lieber, the wife of Alexander Lieber at the time of his death?

If he was divorced from her at that time, then she was not his wife, and she was no more competent to testify regarding the divorce proceedings than was Mrs. Bishop qualified to testify regarding her alleged marriage to Dr. Bishop.

That the decree for divorce was granted in the case of Alexander Lieber against Margaret Lieber, there is no question. In fact, plaintiff's amended petition, and entire case, proceeds upon the theory that the decree was granted and valid upon its face, and for that reason she seeks to have it set aside and that it was procured by fraud.

Now concede, for the sake of the argument, that this decree is impeachable in this character of a proceeding, which I deny, nevertheless, it being fair and regular upon its face, it is entitled to full faith and credit until impeached and set aside upon competent testimony. That being unquestionably true, it cannot be legally said that Margaret Lieber was the wife of Alexander Lieber at the time of his death.

The only difference between the two cases is the fact that the contract of marriage, which was one of

the constituent elements of the cause of action in issue and on trial in that case, if entered into, made Dr. Bishop and the plaintiff there husband and wife, and consequently entitled her to dower; while in the case at bar the decree of divorce, it is admitted, destroyed the marital relation which existed between Alexander Lieber and Margaret Lieber, and as an incident thereto destroyed her right to a homestead in his lands, until, at least, the same is set aside and for naught held, which is sought to be done in this case, and that decree, therefore, being one of the necessary constituent elements of plaintiff's case, is equally in issue and on trial here, as was the marriage contract in the Bishop case, and consequently since Alexander Lieber, the other party to that cause of action is dead, Margaret Lieber the surviving party thereto, under the authorities cited, is disqualified as a witness to testify in this cause, touching the impeachment of that decree.

We are, therefore, clearly of the opinion, that the plaintiff was not a competent witness in this case, to testify, as she did, to matters regarding or tending to impeach the decree of divorce rendered by the circuit court of Mercer county, Illinois, in the case of Alexander Lieber against Margaret Lieber, the defendant there, and the plaintiff here.

II.  This brings us to the consideration of the principal question presented by this record, and that is the validity of the decree of divorce rendered by the circuit court of Mercer county, in the case of Alexander Lieber against Margaret Lieber, the defendant there, and the plaintiff in the case at bar.

Preliminary to the consideration of that question, it might be well to state that the judgments and decrees of courts of other States are, under the Constitution of the United States, entitled to full faith and credit in the courts of Missouri and are conclusive as to all questions involved and adjudicated there.

Lieber v. Lieber.

The general rule upon that subject is thus stated in 13 Am. & Eng. Ency Law (2 Ed.), p. 977, viz.: "At the present time it is well settled as a general rule that a judgment rendered in one State or country by a court of competent authority and which has the necessary jurisdiction, is absolutely conclusive as to the merits of the controversy which it settles, and to that extent is binding upon the courts of all other States and countries, and will be recognized by them as conclusive evidence of the facts adjudicated." And continuing, on page 978, the same author states that "the principle upon which foreign judgments are recognized and enforced is that when a court of competent jurisdiction (for instance) adjudges a sum of money to be paid by one person to another an obligation to pay it is created thereby, which the courts of other countries should enforce, and that a person who has had one fair opportunity to try his cause before a competent tribunal, and has availed himself of it, should acquiesce in the result." In support of the rule above announced, and the reason upon which it is bottomed, the author cites hundreds of cases, some of which are from the Supreme Courts of the various States, and others from the Supreme Court of the United States, and from courts of other countries.

At first, this general rule was founded upon comity alone, between the various States and then other countries, without any fixed and definite law upon the subject, and consequently, so variant and conflicting became the rulings of the courts of the various States and other countries upon the subject, that the people of this country undertook to remedy that great evil and established a uniform rule upon the subject, by adopting section 1, of article 4, of the Constitution of the United States, which reads: "Full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State. And the Congress may by general laws prescribe the

manner in which such acts, records and proceedings shall be proved and the effect thereof.''

It would be a supererogation of labor to collect and cite the cases holding that the constitutional provision quoted is binding and controlling upon the courts of this State, as it is upon the courts of the various States of the Union.

In treating this subject the author, in 13 Am. & Eng. Ency. Law (2 Ed.), p. 983, says: ''This controversy was ended by an adjudication of the Supreme Court of the United States, which, though apparently turning on a mere matter of pleading, in reality went deeply into the subject and settled the rule that, under the Federal Constitution and statutes, a judgment rendered by a court of one State has the same effect in every other State as in the State where it was rendered, and is conclusive on the merits of the controversy.'' Citing Mills v. Duryee, 7 Cranch (U. S.), 481. Continuing, the author says: ''And this is now universally recognized as the correct doctrine.'' Citing hundreds of cases from the Supreme Court of the United States, and the courts of the last resort of the various States.

This constitutional provision, as interpreted by the Supreme Court of the United States, and the courts of last resort of the various States of the Union, recognizes that it has certain well-known limitations or exceptions, namely, that such a judgment may be impeached and set aside for fraud practiced upon the court, in the very act of procuring the judgment, and where the defendant was not legally served with process.

In each of those instances, those facts appearing, such a judgment of a court of another State may and should, in a proper proceeding, be set aside and for naught held, by the courts of this State, in the same manner, and to the same extent, as if the judgment

under like conditions had been rendered by a court of this State.

If we correctly understand the position of counsel for the plaintiff, they insist that the decree rendered by the circuit court of Mercer county, Illinois, divorcing Alexander Lieber, is void for both of the reasons previously mentioned, namely, first, that the plaintiff therein perpetrated a fraud upon that court in the actual procurement of the decree; and, second, that the defendant therein was not legally served with process.

We will consider those two propositions in the order stated.

(a)  The law is well settled here and elsewhere, that a court of equity will in a direct proceeding grant relief against a judgment or decree procured by fraud provided the fraud is established by clear, strong and cogent evidence, leaving no room for reasonable doubt of its existence; and provided further, that the fraud thus perpetrated was exercised in the very procurement of the judgment complained of, and was a fraud upon the court, as well as upon the other party to the suit.

The general rule upon that subject is well stated in 16 Am. & Eng. Ency. Law (2 Ed.), p. 380, in the following language: "It must be borne in mind, however, that the fraud which will authorize a court of equity to enjoin a judgment or decree is fraud practiced in the procurement of the judgment or decree itself. A court of equity will not enjoin the judgment merely because it is founded on a cause of action vitiated by fraud, unless the interposition of the fraud as a defense has been prevented by fraud of the opposite party."

The same rule has been announced by this court in numerous cases.

In Murphy v. De France, 101 Mo. l. c. 157, BLACK, J., in speaking for the court used this language: "A

judgment procured by fraud may, of course, be set aside in equity, but the fraud because of which such relief is granted is one in procuring the judgment. As has been said by this court: 'Courts of equity will not vacate or enjoin a judgment merely based upon a cause of action which may be vitiated by fraud, for this is a valid and meritorious defense, which may be interposed, and unless its interposition is prevented by fraud of an adversary, . . . it cannot be asserted against a judgment, either foreign or domestic.' [Payne v. O'Shea, 84 Mo. 129.] 'The fraud,' says Freeman, 'for which a judgment may be vacated or enjoined in equity must be in the procurement of the judgment. If the cause of action be vitiated by fraud, this is a defense which must be interposed, and unless its interposition be prevented by fraud, it cannot be asserted against the judgment.' [Freeman on Judg. (3 Ed.), sec. 489.] Courts in equity do not grant such relief for the purpose of giving a defeated party a second opportunity to be heard on the merits of his defense; and the relief is confined to those cases where the judgment is procured by fraud or through excusable mistake or unavoidable accident. [Freeman, Judg., sec. 486.]''

In Payne v. O'Shea, 84 Mo. l. c. 133, the court used this language: "In this State a proceeding in the nature of a bill in equity will lie to enjoin and avoid a domestic judgment obtained through fraud, and like remedies exist and may be resorted to against judgments obtained in other States, when sued on in this State. [Freeman on Judg., sec. 561; High on Inj. (2 Ed.), sec. 69.] The fraud, however, for which a judgment will be enjoined must be in the procurement of the judgment. And courts of equity will not vacate or enjoin a judgment merely based upon a cause of action which may be vitiated by fraud, for this is a valid and meritorious defense, which may be interposed, and unless its interposition is prevented by

fraud of an adversary, as was the case in Ward v. Quinlivin, 57 Mo. 426, it cannot be asserted against a judgment, either foreign or domestic."

In the case of Hamilton v. McLean, 139 Mo. 678, the plaintiff brought suit in partition against the defendants, claiming to be one of the heirs of a certain deceased person to a tract of land; the defendants presented and introduced in evidence a deed from the deceased, conveying to them the entire interest therein. It was contended in that suit, that said deed had been obtained by undue influence, and had been concealed and recorded on the day of the decedent's death. In that case, the defendants recovered judgment. Thereafter, a second suit in equity (the one last cited) was brought to set aside the former judgment on the ground that the deed mentioned in the first suit was a forgery, and alleging that the facts to establish that fact were discovered since the rendition of the judgment in the partition suit. A demurrer was filed to the petition, for the reason that it did not state facts sufficient to constitute a cause of action, which was by the trial court sustained, and plaintiff appealed. In discussing that question, this court on page 685, said:

"Whatever the rule may be elsewhere, it is well settled in this State in order that a judgment may be set aside for fraud in a direct proceeding for that purpose it must be made to appear that fraud was practiced in the very act of obtaining the judgment. [Lewis v. Williams, 54 Mo. 200.]

"Payne v. O'Shea, 84 Mo. 129, was a bill in equity to enjoin and restrain the enforcement of a judgment obtained before a justice of the peace and asking for a settlement and accounting between the parties, and it was held that while a judgment may be set aside in equity for fraud, the fraud must be in the procurement of the judgment, and not merely fraud in the cause of action on which the judgment is founded, and which

could have been interposed as a defense, unless its interposition as a defense was prevented by the fraud of the adverse party. That case was followed and approved in Murphy v. De France, 101 Mo. 151, in which is quoted with approval the following from Freeman on Judg. (3 Ed.), sec. 489: 'The fraud for which a judgment may be vacated or enjoined in equity must be in the procurement of the judgment. If the cause of action be vitiated by fraud, this is a defense which must be interposed, and unless its interposition be prevented by fraud, it cannot be asserted against the judgment.' The court also said 'courts of equity do not grant such relief for the purpose of giving a defeated party a second opportunity to be heard on the merits of his defense; and the relief is confined to those cases where the judgment is procured by fraud or through excusable mistake or unavoidable accident.' [See, also, Murphy v. De France, 105 Mo. 53; Oxley Stave Co. v. Butler Co., 121 Mo. 614.]

"The same question was before the Supreme Court again in Nichols v. Stevens, 123 Mo. 96, and it was held that in order that a judgment may be set aside upon the ground of its having been obtained by fraud it must appear that the judgment was 'concocted in fraud; that fraud was practiced in the very act of obtaining the judgment. The fraud in such case must be actual fraud as contradistinguished from a judgment obtained on false evidence or a forged instrument on the trial.' [See, also, Moody v. Peyton, 135 Mo. 482; 1 Bigelow on Fraud, pp. 86, 87; Ward v. Southfield, 102 N. Y. 287.]

" 'The doctrine is equally well settled that the court will not set aside a judgment because it was founded on a fraudulent instrument, or perjured evidence, or for any matter which was actually presented and considered in the judgment assailed. . . . That the mischief of retrying every case in which the judgment or decree rendered on false testimony, given by

perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterward ascertained to be forged was in issue, and which are afterwards ascertained to be forged or fraudulent, would be greater, by reason of the endless nature of the strife, than any compensation arising from doing justice in individual cases.' [United States v. Throckmorton, 98 U. S. 61.] In that case there is also quoted with approval the following from Wells on Res Adjudicata, sec. 499: 'Fraud vitiates everything, and a judgment equally with a contract; that is, a judgment obtained directly by fraud, and not merely a judgment founded on a fraudulent instrument; for, in general, equity will not go again into the merits of an action for the purpose of detecting and annulling the fraud. . . . Likewise, there are few exceptions to the rule that equity will not go behind the judgment to interpose in the cause of action itself, but only when there was some hindrance beside the negligence of the defendant, in presenting the defense in the legal action.'

"While the petition shows that the deed in question was assailed by plaintiff in the partition suit on the ground of its having been obtained by Mrs. McLean and Mrs. Bates by fraud and that that question was decided adversely to him, he now undertakes by this action to escape the legal consequence flowing from the result of that adjudication, by averring that the deed was a forgery, which defendants knew, and which he did not learn until the determination of that suit when his suspicions were aroused by the statements made by Mrs. Bates whose deposition was being taken in another suit. It thus appears that plaintiff was afforded an opportunity of showing that the deed was a forgery upon the trial of the partition suit, and having failed to do so without interposition on the part of the defendants herein, he is not entitled to have the judgment in that case set aside merely to give him a

second opportunity to show that the deed was a forgery. The fact that defendants had the deed recorded had no tendency whatever to show that it was a forgery, or to mislead any person with respect thereto.

"In Duncan v. Lyon, 3 Johns. Ch. 351, it is said: 'It is a settled principle, that a party will not be aided after a trial at law, unless he can impeach the justice of the verdict or report, by facts, or on grounds of which he could not have availed himself, or was prevented from doing it by fraud or accident, or the act of the opposite party, unmixed with fault or negligence on his part.' [Shelbina Hotel Assn. v. Parker, 58 Mo. 327.]

"But even if the deed was a forgery and the judgment was founded thereon, the judgment will not be set aside and the merits of the action again gone into for the purpose of demonstrating that it was in fact a forgery. Therefore, admitting all of the material allegations of the petition to be true, it does not appear therefrom that fraud was practiced in the very act of obtaining the judgment; or that plaintiff was prevented by any interposition of defendants from showing that fact if true, in the partition suit, and therefore failed to state a cause of action. The judgment is affirmed."

Upon the affirmance of the judgment by this court, in the case last cited, the same plaintiff instituted a third suit, against the same defendants, stating substantially, but in a more elaborate form, the facts previously stated in the pleadings filed in the two previous suits. To this petition defendants again filed a demurrer, for the same reasons stated in the demurrer to the second petition. This demurrer was also sustained by the trial court, and plaintiff again appealed. The style of the last case is Hamilton v. McLean, and is reported in 169 Mo. 51, and on page 69 thereof this court again, in discussing what fraud was required to set aside a judgment, used this language:

"When the pleadings in this case are read and considered as a whole, and in connection with the pleadings in the partition proceedings in the case of this plaintiff against Eliza Armstrong et al., copied therein, we must determine that it is nothing more than a proceeding to have this court set aside and annul the decree obtained in that suit on the strength of what plaintiff characterizes as a forged deed, used by the defendant therein to deceive him and the court called to adjudge and settle the controversy therein involved.

"Such being the case before us, we come again to the question, What fraud can be considered in an effort to set aside and annul the decree rendered by a court of competent jurisdiction in a proceeding wherein all the parties thereto have been brought properly before the court? As said above, the charge made in the petition, now before us for consideration, when stripped of its useless allegations and the conclusions of the pleader made therein, is that the partition decree, in the case of this plaintiff against Eliza Armstrong et al., rendered on January 28, 1895, was based upon a forged deed used by the defendants in that case.

"To use again the language of the opinion in 139 Mo. 678, supra, in disposing of this question, when then before the court for consideration, 'Whatever the rule may be elsewhere, it is well settled in this State, in order that a judgment may be set aside in a direct proceeding for that purpose, it must be made to appear that fraud was practiced in the very act of obtaining the judgment;' that the fraud must be in the procurement of the judgment and not merely in the cause of action upon which the judgment is founded, and which could have been interposed as a defense, unless its interposition as a defense was prevented by the fraud of the adverse party.

"In Nichols v. Stevens, 123 Mo. l. c. 116, it was held, that in order to set aside a judgment on the ground of its having been obtained by fraud, it must appear, 'That the judgment against the corporation was concocted in fraud; that fraud was practiced in the very act of obtaining the judgment. The fraud in such case, must be actual fraud as contradistinguished from a judgment obtained upon false evidence or a forged instrument on the trial.'

"When the same question was before the court in Moody v. Peyton, 135 Mo. 489, it was there said, 'The rule is that when a judgment is sought to be impeached on the ground of fraud, that such impeachment can only occur when satisfactory evidence is offered that such impeaching fraud occurred in the very concoction or procurement of the judgment.'

"In United States v. Throckmorton, 98 U. S. 61, that court thus expressed itself: 'The doctrine is equally well settled that the court will not set aside a judgment because it was founded on a fraudulent instrument or perjured evidence, or for any matter which was actually presented and considered in the judgment assailed. . . . That the mischief of retrying every case in which the judgment or decree rendered on false testimony, given by perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterwards ascertained to be forged or fraudulent, would be greater, by reason of the endless nature of the strife, than any compensation arising from doing justice in individual cases.'

"Mr. Story, in his work on Equity Jurisprudence (11 Ed.), sec. 1582, thus states the rule: 'The only question of fraud which is open to examination in a court of equity, as a ground for enjoining the judgment of any court having jurisdiction of the case, whether domestic or foreign, is such as intervened in the proceedings by which the judgment was obtained. All

questions, prior to the proceedings by which the judgment was obtained, are necessarily concluded by it.'

"In Ritchie v. McMullen, 79 Fed. 531, the court had under consideration the question of setting aside a former judgment on the ground of fraud in its procurement. After announcing the rule that the fraud for which a court of equity will annul a judgment must be extrinsic or collateral to the matter tried, this language was used: 'The only fraud alleged is the false statement by the McMullens that they owned valid coupons, and were able and ready to deliver them. This was not an extrinsic or collateral fraud. It was a false statement in respect to a fact essential to the plaintiff's right to recovery, and the fact that it deceived the defendant as well as the court does not change its character, as being a fraud in respect to an issue of a former suit. It was the duty of Ritchie, by inquiry, to learn the facts in respect to plaintiff's cause of action.'

"The case at bar cannot be distinguished in principle from the authority above referred to, and numerous others that might be cited if further reference was deemed necessary, in which similar relief has been refused, and in which the doctrine contended for by plaintiff was denied. But appellant now contends that whatever might have heretofore been the rule in this court upon this question, the rule has been greatly modified in the case of Wonderly v. Lafayette County, 150 Mo. 635, and that it may now be construed to be, that judgments are impeachable for fraud relating to the merits of the controversy, and perpetrated against a party and the court called upon to consider it.

"There is nothing in the Wonderly case which militates against the rule announced in any of the foregoing authorities. The rule there enunciated does not apply to the facts here. The distinction is obvious. In the Wonderly case the petition was predicated upon

fraud in inducing the Federal court to assume juris-
diction, and the only question involved in that cause
related to the manner of obtaining jurisdiction of the
cause.   In other words, whether the judgment could
be attacked for the fraud of Wonderly in having the
Federal court take jurisdiction in the case through the
interposition of Francis Owens and render judgment
that could not have been obtained in the courts of
this State.   There a fraud was not only perpetrated
upon the defendant, but the court as well, in inducing
the latter to assume jurisdiction of the cause.   And
it was that fraud upon the court that gave the right
to set aside the judgment there obtained.   It has uni-
formly been held that fraud in 'acquiring jurisdiction
of the cause' affords ample ground for impeaching a
judgment obtained thereby.   [1 Bigelow on Fraud, 87;
Adler v. Land Co., 114 Ala. 551.]

"Here, there is no pretense of fraud in acquiring
jurisdiction in the partition suit now sought to be set
aside and annulled.   On the contrary, the annulment
of the decree is sought on the ground that the de-
fendant had used a forged deed in obtaining it.   In
the Wonderly case, the court cites the case of Hamil-
ton v. McLean, 139 Mo. 678, supra, with approval.

"While it is true, as contended by plaintiff, that
the deed in question was assailed in the partition suit
on the ground of its having been obtained by fraud
and undue influence, yet that was not the only issue
tendered by the pleadings.   In that case the petition
referring to the deed in question and two others, exe-
cuted at the same time, alleged that 'they were and
are null and void.'   The defendants in their answer in
that suit set up that deed averring its execution and
delivery by John L. Hamilton, whereby he 'conveyed
his undivided one-half interest in and to the land in the
petition described to these defendants.'   The reply,
after denying each and every allegation contained in
the answer, alleged that the deed in question 'is not

and never was the act and deed of John A. Hamilton.'
Thus it appears that the execution and validity of the
deed in the controversy was directly involved in the
partition suit.

"The validity of the deed having been directly,
and not extrinsically or collaterally, involved in that
case, the plaintiff is concluded thereby and cannot, in
the circumstances of this case, again go into the merits
of that controversy, even though the deed may after-
wards have been discovered to be a forgery. For it is
entirely settled in this State that what might have
been shown under the pleadings is deemed settled as
much as those in respect to which evidence was ad-
duced, and a failure to introduce evidence affecting
those matters in issue by the pleading in nowise af-
fects the question of what facts were actually settled.
[Donnell v. Wright, 147 Mo. l. c. 647.]

"Counsel for plaintiff, however, seek to excuse
their failure to show that the deed was a forgery upon
the trial of the partition suit by alleging in their sec-
ond amended petition that the defendants had 'at
divers times subsequent to the date of the deed and
before the trial of the partition suit, fraudulently rep-
resented that the deed was genuine, and that it had
been signed by John L. Hamilton.' This was not a
statement of an extrinsic or collateral matter. It was
a fraudulent statement touching a matter necessarily
involved in the trial of the merits of the partition suit;
and the mere fact that both the plaintiff and the court
were deceived thereby does not affect the question in-
volved here, or change the character of such represen-
tations. It devolved upon the plaintiff to ascertain
the facts in respect to the alleged execution and valid-
ity of the deed, and he had no right to rely alone upon
the defendants' statements concerning it. It is not
claimed that any confidential relations existed between
the plaintiff and defendants. They occupied antag-
onistic positions towards the property and towards

each other so that plaintiff relied at his peril upon
any statement defendants may have made relative to
the character of their title. [Ritchie v. McMullen, 79
Fed. l. c. 531; Lewis v. Land Co., 124 Mo. 687; Wood
v. Amory, 105 N. Y. 282.]

"Moreover, the pleadings in the partition suit,
which are set out in the petition herein, conclusively
show that the plaintiff was not misled or induced by
any statements made by the defendants to admit the
genuineness of the deed in question, but specifically
and emphatically denied the execution thereof.

"The plaintiff having been given an opportunity
of showing that the deed was a forgery, upon the trial
of the former suit, and having failed to do so, the
judgment will not now be set aside, and the merits
of the action gone into again."

In the case of Railroad v. Mirrielees, 182 Mo. 126,
the same question again came before this court for
consideration. In that case, the bill charged that the
judgment which was sought to be set aside was ob-
tained by the defendant, the plaintiff in the former
suit, against the plaintiff, the defendant in the for-
mer, for personal injuries, alleged to have been re-
ceived upon perjured testimony and that the plaintiff,
the defendant in the former suit, did not discover the
perjury until after the rendition of the judgment, etc.
In discussing that question, GANTT, P. J., at page 140,
used this language:

"It will be observed that the bill contains no aver-
ment of any fraud whatever extrinsic or collateral to
the matters involved in the issues on trial in the suit
in which the judgment now attacked was rendered. On
the contrary it affirmatively appears that the only
fraud propounded or suggested is this alleged false
testimony given by the then plaintiff in the case. It
appears on the face of the petition that such testi-
mony was given on clearly defined issues then on trial,
to-wit, the nature and extent of plaintiff's injuries

and his earning capacity before and after receiving said injuries.

"There is no allegation as to what diligence, if any, was exercised by the railroad company in preparing to meet these essential issues on the trial, nor that it was hindered or prevented by any act of the plaintiff in said suit from exercising such diligence.

"There is no averment of any artifice, trick, promise or fraudulent conduct of the said plaintiff whereby the company was in any manner deceived or lulled into security or by any means prevented from obtaining testimony to rebut the said evidence of plaintiff.

"The bill nowhere sets out the newly-discovered evidence or the names of the witnesses by whom the same could be established and entirely fails to show a valid defense to such action.

"From the foregoing summary it will be noticed that the only fraudulent act alleged in the bill against the defendant Mirrielees, the plaintiff in the damage case, is that he falsely testified as to the nature and extent of his injuries. It necessarily related to the cause of action then on trial and was in no sense a fraud committed on the court in the procurement of the judgment. In Oxley Stave Company v. Butler County, 121 Mo. 614, we expressed the result of the decisions of this court on this question as follows: 'Perhaps there is no subject upon which the decisions of this court have been more uniform and consistent than those in regard to the character of evidence required in courts of equity to vacate a final judgment. Beginning with Jones v. Brinker, 20 Mo. 87, and coming down to Murphy v. De France, 105 Mo. 53, it has been uniformly held that the "fraud for which a judgment may be vacated or enjoined in equity must be in the procurement of the judgment. If the cause of action is vitiated by fraud, this is a defense which must be interposed, and unless its interposition is prevented by fraud, it cannot be asserted against the judgment." '

"In Hamilton v. McLean, 139 Mo. 678, BURGESS, J., speaking for this court in a case in which the ground for setting aside the judgment was the setting up and pleading as genuine a forged deed, knowing it to be a forgery, said: 'But even if the deed was a forgery and the judgment was founded thereon, the judgment will not be set aside and the merits of the action again gone into for the purpose of demonstrating that it was in fact a forgery. Therefore, admitting all the material allegations of the petition to be true, it does not appear therefrom that fraud was practiced in the very act of obtaining the judgment; or that plaintiff was prevented from any interposition of defendants from showing that fact, if true, in the partition suit, and therefore failed to state a cause of action.'

"It is perfectly obvious there can be no distinction between introducing false and forged instruments in evidence and swearing falsely as a witness. Those two practices fall within the same category, whether in law or morals.

"In United States v. Throckmorton, 98 U. S. 61, Judge MILLER very pithily expressed what we conceived to be the accepted doctrine of this subject in this State as well as elsewhere: 'Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced upon him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side; these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside

and annul the former judgment or decree, and open the case for a new and fair hearing. [Citing a number of cases.] In all these cases, and many others which have been examined, relief has been granted on the ground that by some fraud practiced directly upon the party seeking relief against the judgment or decree, that party has been prevented from presenting all of his case to the court.' This was followed in Irvine v. Leyh, 124 Mo. 361.

"In Gray v. Barton, 62 Mich. 196, the identical ground upon which plaintiff relies to set aside this judgment was made the basis of that suit and the Supreme Court of Michigan said: 'But it does not seem to us that the mere allegation that the defendant committed perjury upon the trial, and belief of the complainant that he can establish such perjury upon a retrial, is such a fraud as will authorize a court of equity to interfere, after a judgment against him in a court of law has been affirmed by the highest tribunal. The establishment of such a right in the defeated party would open the way for another contest in equity in almost, if not in every, suit decided at law.' [See, also, Hass v. Billings, 42 Minn. 67; Miller v. Morse, 23 Mich. 368; Friese v. Hummel, 26 Ore. 145; s. c., 46 Am. St. 610; Noll v. Chattanooga Co., 38 S. W. (Tenn.) 287; Vaughn v. Johnson, 9 N. J. Eq. 173; Guthrie v. Doud, 33 Ill. App. 68; Maryland Steel Co. v. Marney, 91 Md. 360; Bates v. Hamilton, 144 Mo. 11 and 12.]

"In Vance v. Burbank, 101 U. S. 514, Chief Justice WAITE said: 'It has also been settled that the fraud in respect to which relief will be granted in this class of cases must be such as has been practiced on the unsuccessful party, and prevented him from exhibiting his case fully to the department, so that it may properly be said there has never been a decision in a real contest about the subject-matter of the inquiry. False testimony or forged documents even are not enough,

if the disputed matter has actually been presented to or considered by the appropriate tribunal.'

"Nothing can be added to the reasoning of the courts on this question. Accordingly we hold that the allegation of perjury on the part of plaintiff in the original suit is not sufficient to set aside his judgment."

Under the constitutional provision before quoted and according to the decisions of the various courts construing the same, the judgment of a sister State stands upon precisely the same foundation that a domestic judgment stands, and it requires the same kind of fraud, and the same degree or weight of evidence, to set aside the former as it does the latter.

Now if we apply the rules of law before announced by this court, and the other courts referred to, to the evidence introduced in this case to establish fraud on the part of Alexander Lieber, in procuring the decree of divorce from Margaret Lieber, in the circuit court of Mercer county, Illinois, it will be clearly seen that it falls far short of that standard. In fact, I have read and reread this record with a view to find such evidence, but in vain. If it contains any such evidence of fraud in the procurement of the decree for divorce, I have been unable to find it, nor have learned counsel pointed to, or called our attention to, any such evidence.

The only testimony which I suppose could be tortured into evidence of fraud of any kind, was that of plaintiff's two sons, who testified that they heard their father, Alexander Lieber, state upon one occasion, that he had to pay some party, I believe his attorney, forty dollars to swear falsely for him in the divorce case. Conceding for the sake of the argument that he made that statement and that it was true in point of fact (which is not true, as I will presently show), still that conduct on his part and the false swearing on the part of the attorney did not go to the very pro-

curement of the decree, as explained in the cases previously quoted from. At most it was perjured testimony, and that is not sufficient under the authorities cited and quoted from, to justify a court of equity to set aside a decree of court, either foreign or domestic. [Railroad v. Mirrielees, supra; Hamilton v. McLean, supra; Ibid., 169 Mo., supra.]

Returning to the testimony of the two sons who testified that they heard their father state that he had given some one forty dollars to swear falsely in the divorce case. I previously stated, in parenthesis, that this testimony was not true, and my reason for so saying and holding is this: The case was tried before a master of chancery, and according to the chancery practice, all the evidence in the case was in the form of depositions, and there were only three witnesses who testified, and they were Alexander Lieber, the plaintiff, L. H. Gerard, and Amos F. Waterman. These depositions, with all the other proceedings had in the case, were introduced in evidence in this case, and they show that the plaintiff there was the only witness who testified to any of the merits of the case, and the other two were simply character witnesses, not pretending to testify to any of the merits. Now it seems wholly improbable that the plaintiff would pay a character witness forty dollars to testify as to his character, especially when he had lived in Illinois for at least two years before the suit was instituted; and common experience teaches us that almost anyone living can procure such testimony without resorting to bribery and subordination of perjury, as charged here, and especially by a man who was in the financial straits, as the record in this case shows plaintiff was in, at that time.

So viewing this case as you may, there is not a scintilla of evidence preserved in this record which tends in the slightest degree to show that the decree

of divorce was procured by fraud perpetrated upon the court or upon anyone else, for that matter.

I am, therefore, of the opinion that the circuit court erred in so holding.

(b)    The next proposition presented for determination, in the order before mentioned, is, was Margaret Lieber, the defendant in the divorce suit, duly served with process?

The record in this case shows that the circuit court of Mercer county, Illinois, the court which tried the divorce case, was a court of record and of general jurisdiction, and "where reliance is placed on a foreign jurisdiction, the presumption is that such court had authority to render the judgment in question, and that the necessary jurisdiction was acquired properly." [13 Am. & Eng. Ency. Law (2 Ed.), p. 995.] In support of the text, many cases are cited from numerous States, as well as from the Federal courts, and courts of foreign countries.

In Bruckman v. Taussig, 7 Colo. 561, the court said: "The presumptions in favor of jurisdiction are the same whether the judgment relied on is domestic, foreign, or of one of the sister States of this Union." The same rule is announced by this court, in the case of State ex rel. v. Williamson, 57 Mo. 192.

Not only does this presumption as to the jurisdiction of the court attend a judgment, foreign and domestic, when relied upon as the basis of, or as evidence in another case, but the question of jurisdiction is also one of the issuable facts involved in the case, which is tried and adjudicated along with all the other facts therein, and the judgment pronounced thereon is just as binding and conclusive as it is upon all the other facts tried and determined therewith.

This question was pointedly put, and squarely decided by the unanimous opinion of this court, in a carefully considered and ably written opinion by MARSHALL, J., in the case of Fears v. Riley, 148 Mo. 49,

l. c. 58, which was a direct proceeding to set a judgment aside. In discussing this question he said:

"It is the settled law in our State that in order to set aside a judgment for fraud, even in a direct proceeding, it must appear that fraud was practiced in the very act of obtaining the judgment. [Lewis v. Williams, 54 Mo. 200.] It is not enough that there was fraud in the cause of action on which the judgment is founded and which could have been interposed as a defense (unless its interposition was prevented as a defense by fraud). [Payne v. O'Shea, 84 Mo. 129; Murphy v. De France, 105 Mo. 53; Oxley Stave Co. v. Butler Co., 121 Mo. 614.] The judgment must be concocted in fraud, and the fraud must be actual fraud as contradistinguished from a judgment obtained on false evidence. [Moody v. Peyton, 135 Mo, 482.] These principles and these cases have lately been reviewed and approved by this court in Hamilton v. McLean, 139 Mo. 678, and in Bates v. Hamilton, 144 Mo. 1.

"Apply these tests to the allegations of the petition, and we have this result: It may have been false that Laura Riley was a resident of Audrain county, but that was a fact to be tried in that case, which was open to denial and contest by the defendant, and no more divests the court of jurisdiction or renders its judgment void on the ground of fraud than any other fact falsely asserted or testified to in the case. It may have been that she joined Tobe Lee, a minor, as a party defendant so as to be able to institute the suit in the county in which she lived and one of the defendants is found, under section 2009, Revised Statutes 1889, but this was no fraud on the court, because the court was informed that Lee was a minor, and it appointed a guardian *ad litem* for him, and he filed an answer. Moreover it is wholly a mistake to say that an infant is not liable in an action for tort, e. g., as-

239 Sup.—4

sault, false imprisonment, libel, slander, etc.   [Conway v. Reed, 66 Mo. 346; Morgan v. Cox, 22 Mo. 374; Addison on Torts (6 Ed.), p. 155, par. 101; Cooley on Torts (2 Ed.), p. 120.]   Tobe Lee was liable in this case because he circulated the libel.  [Townshend on S. & L. (4 Ed.), pp. 101, 102.]   No fraud was therefore, perpetrated in the very act of procuring the judgment in this respect.   It may be Laura Riley perpetrated a wrong on Preston and Laveene in bringing them to Audrain county, under a criminal warrant, and then having the summons served on them in the civil case, but that was not fraud on the court, and was a defense which Preston and Laveene alone could make, and they did not do so, but on the contrary filed an answer in the case.   The filing of the amended petition in the Randolph Circuit Court, keeping Tobe Lee as a defendant, and at the trial dismissing the case as to him, was as herein shown no fraud upon the court, and had no different effect upon the case than if any other resident of Audrain county had been the defendant instead of Tobe Lee.   Taking judgment while a motion for security for costs was pending was not a fraud upon the court, for the court takes a judicial notice of the state of a case as shown by its own records.   Only a motion going to the merits dispenses with the necessity of answering.   [Hill v. Meyer, 47 Mo. 585.]   Aside from this Fears filed no motion for security for cost.   That motion was filed by Preston and Laveene, and they also answered.   The order for an alias summons for Fears, entered at the September term, 1892, but not executed because the sheriff shortly thereafter returned the original summons, personally served on Fears on the 24th day of February, 1892, was no fraud upon the court, and could not possibly have misled Fears.   For he knew he was properly served in February to appear at the September term, and says in his testimony in this case that he sent the summons and copy of the

amended petition to Preston and asked him to attend to it, which he did by turning it over to his attorney. The fact that the attorney did not file an answer because of his erroneous opinion that Fears was not obliged to answer until the alias summons was served on him, and that Fears relied on this advice, in no manner affords any ground for equitable relief or affords the slightest basis for a claim that the judgment was procured by fraud. [Biebinger v. Taylor, 64 Mo. 63; Ketchum v. Harlowe, 84 Mo. 225.] Whether Fears had a good defense to the libel suit was a matter to be litigated in that case, and can not be afterwards inquired into. He had his opportunity to have a day in court to have that question determined. It can not be inquired into in this proceeding.''

The case at bar, was tried in accordance to the rule just announced, and the Illinois court actually heard evidence in the question of Alexander Lieber being a resident of that State. I copy the following from his testimony given in that case, viz.: ''I reside in this (Illinois) State and have resided therein for more than one year past prior to the commencement of this suit.''

It is true, however, the evidence tended to show, that at the expiration of that two years, he left Illinois and returned to Missouri and located at Perry for three or four months and from there he traveled several weeks in his wagon, from place to place through Missouri, Iowa and Kansas, and finally returned to Illinois, locating this time in Mercer county. This evidence will receive further notice later.

This was ample evidence to support the finding and decree of that court, as to its jurisdiction over the person of Alexander Lieber, and of the subject-matter of the suit.

The truth is, that in ninety-nine cases out of every one hundred of this character, which are tried in the courts of this State, the residence of the plaintiff is

shown by no stronger or more convincing evidence
than was the evidence upon which the Illinois court
found Alexander Lieber was a resident of that State
for the requisite length of time prescribed by the stat-
utes. Speaking upon that subject from personal
knowledge and experience, and I dare say, that my
associates, who have graced the circuit bench will con-
cur with me in that statement.

That being true, we should not require of the
courts of a sister State a greater weight of evidence,
in this class of cases, than our own courts demand in
similar cases.

From this state of the record, we not only have
the legal presumption that the Illinois court had ju-
risdiction over the plaintiff, Alexander Lieber, in the
divorce suit, but we also have the solemn decree of
the court predicated upon a finding that he was a res-
ident, and that finding was amply supported by posi-
tive evidence introduced at the trial.

Now what is the character of the testimony which
was introduced at the trial of this cause, and relied
upon by plaintiff, to set aside and annul the decree of
divorce rendered by the circuit court of Mercer county,
Illinois? It was given principally by Ben and Ed
Lieber, the two sons of Alexander and Margaret Lie-
ber, the plaintiff and defendant in that case. It should
be remembered that their parents were married on
May 24, 1857, in the city of St. Joseph, Missouri; that
they lived in this State until the latter part of 1865,
when they went to Quincy, Illinois, where the separa-
tion occurred, and from there he and these two sons
went to Warsaw, Illinois, and remained there about
two years, when they returned to Perry, Missouri,
where they remained some three or four months, and
from there they wandered from place to place over
this State, Iowa, and perhaps Kansas, their wander-
ings lasting several weeks, when they again returned

to Illinois, and shortly thereafter the suit for divorce was instituted.

Those facts were testified to by those two sons, and it is seriously contended that that testimony was only slightly corroborated, as it is, in some few particulars, which were wholly immaterial, by other witnesses who lived in Missouri and knew nothing of the Illinois affairs, except the plaintiff, who as we have shown, was an incompetent witness. One of those sons, Ben, testified that he was only five years of age when they went to Illinois, and consequently could not have been much over seven when the decree of divorce was rendered, which was about forty years before he was called upon to testify in this case, as to what took place back there. And as to Ed, the other son, the record does not show his age, and there is no way to tell whether he was older or younger than Ben, but under no circumstances could he have been over seven years of age, when they went to Quincy, nor over nine, when the decree for divorce was rendered, which was at least thirty-eight years before he was called upon to testify as to the conduct and residence of their father, prior to the date of his divorce. Common knowledge and experience teach us how treacherous and unreliable the memory of even adults is, much less of children, almost babies, after the lapse of thirty-eight or forty years.

If a decree of a court of record of general jurisdiction, after trial and solemn rendition of judgment can be set aside and for naught held, upon such flimsy evidence as this, then the judgments of our courts are not worth the paper upon which they are written.

If we should view this evidence in the most favorable light for the plaintiff, and draw therefrom the most unfavorable conclusions possible against Alexander Lieber, it would then only slightly tend to prove that he left Illinois, after residing there two years or more, and returned to Missouri, Iowa and Kansas,

with a view of seeking a new home, but finding none
which suited him after five or six months travel in a
wagon he returned to Illinois, and there again took up
his residence, which he had never lost in that State,
or acquired in another.

I am therefore, clearly of the opinion, that the
evidence introduced, by plaintiff, in this cause, was
wholly insufficient to sustain the judgment of the trial
court, setting aside and holding for naught the de-
cree for divorce rendered by the circuit court of Mer-
cer county, Illinois.

III.  There is another reason, equally valid, why
the judgment of the lower court cannot stand, and
that is because it is elementary that a judgment ren-
dered by a court having jurisdiction of the parties
and the subject-matter, unless reversed or annulled in
some proper proceeding, is not open to contradiction
or impeachment in respect to its validity, verity, or
binding effect by the parties thereto, in any collateral
action or proceeding.

It is further clear that this suit does violence to
that elementary rule.  It is a suit to set aside a deed
and to admeasure and set off a homestead to the plain-
tiff in the lands of Alexander Lieber deceased, and
only incidentally asks to have the decree for divorce
set aside for that purpose.  To make this view of the
case clearer, the original petition did not mention the
decree for divorce at all, while the amended petition
asks to have it set aside to the extent of letting in
plaintiff's claim of right to a homestead in the lands
mentioned.  Therefore, this suit, in so far as the de-
cree for divorce is concerned, is a collateral attack
upon it.

The authorities define a collateral attack to be an
attempt to impeach a judgment in a proceeding not
instituted for the express purpose of annulling such
judgment:  [17 Am. & Eng. Ency. of Law (2 Ed.),

p. 848, and the numerous cases cited; Lovett v. Russell, 138 Mo. 478, 1. c. 482; Truesdail v. McCormick, 126 Mo. 39.]

Not only does the record upon its face show that this suit is only a collateral attack upon the Illinois decree for divorce, but it also shows that in the very nature of things a direct proceeding for that purpose could not possibly have been brought and maintained, for the simple reason that a judgment in a divorce case is one *in rem* (Gould v. Crow, 57 Mo. 200), and Alexander Lieber, the plaintiff, in whose favor that judgment was rendered, is dead. He, therefore, could not have been made a party to such a suit, nor could such a suit have been maintained against him, even though it should have been instituted. Not only that, the subject-matter of such a suit is and would necessarily have to be the "judgment *in rem*," which was rendered in the divorce suit, which in truth and in fact is nothing more or less that the *dissolved marital relation, which formally existed between* Alexander Lieber and Margaret Lieber. That judgment *in rem*, or dissolved relationship, would not descend to his heirs, nor would it pass into the hands to his executor or administrator. Consequently there could be no person or thing represented in any. such suit after one of the parties thereto has died. This is clearly the reason why counsel did not bring a direct bill in equity to set aside the Illinois decree for divorce.

But that is no valid excuse for plaintiff's having brought this collateral proceeding attacking the decree of divorce, for the simple reason that she knew of the divorce for a period of fifteen years before Alexander Lieber died, and lived within a mile of him some two years of that time immediately prior to his death. She had an abundance of time in which she could have brought this suit before he died, and had she done so there would have been proper parties and

subject-matter, and he would have been given a hearing upon the merits of the cause. But instead of suing within a reasonable time after she learned of the decree of divorce, she waited fifteen years, and seven days after death had claimed him, before she brought this suit, and thereby seeks to take practically his entire estate from his second wife and her children by him begotten.

Those facts show that there is no equity in her bill, or in the case made by her. [Buffington v. Carty, 195 Mo. 490, l. c. 499.]

The court below, forty years after the divorce had been granted, virtually retried it in this State, upon the testimony of the plaintiff, who was clearly an incompetent witness, and upon that of the two sons, who at that time were little children, scarcely more than babies, and that, too, when Alexander Lieber's lips were sealed with death, and those of the defendant were closed by law, and thereupon entered a decree, not only taking from the defendant and her children by Alexander Lieber, the fruits of their joint labor, but robbed her of her good name and bastardized their offspring.

In this connection, counsel for plaintiff lay much stress upon the fact that the defendant was present during all those years and was a party to all the things testified to by the plaintiff and her two sons, nevertheless being present in court she never dared take the witness stand and deny anything they testified to, *ergo,* everything said was true, and she by her conduct has practically conceded it.

This is an erroneous view of the law, for even though it be conceded that this court might hold that plaintiff was a competent witness, to show that she was the innocent and injured party in the former trial, yet it must be remembered that the defendant could not rebut that evidence without conceding that the merits of the former case could properly be inquired

into here, which she was persistently denied all the way through this case, and, second, what good would have resulted to her by so doing, when her husband was dead, and could not speak? She would have been confronted and contradicted by the plaintiff and her two sons, which in all probability would have destroyed the weight of her testimony, and the same result would have been reached by the trial court, and that too, without any hope of review by this court, had she done so, consequently she acted properly and wisely in remaining off the stand.

V. This record shows that the eighty acres situate in section 16, township 37, range 23, the land upon which Alexander Lieber resided at the time of his death, was worth more than $2,000, and that the twenty acres of wild land situated in section 31, township 38, range 23, which was more than three miles from the homestead, could under no circumstances be considered a part thereof, nevertheless, the judgment below set the deed aside as to this twenty acres also.

Clearly the judgment in that regard was erroneous, even on plaintiff's theory of the case.

I am, therefore, of the opinion, that the judgment should be reversed, and the bill dismissed.

All concur, except *Valliant, C. J.,* and *Kennish, J.,* who dissent in separate opinions; *Graves, J.,* concurs in the result.


## DISSENTING OPINION.

VALLIANT, C. J.—Plaintiff, claiming to be the widow of Alexander Lieber, deceased, brings this suit against the defendant, who also claims to be his widow, to set aside a deed to certain land in Hickory county, to-wit: North half of northeast quarter of sec-

tion 16, township 37; and west half of southeast quarter of the southeast quarter of section 31, township 38, all in range 33, executed by Lieber in his lifetime to defendant. The petition is in two counts; the first is in equity to cancel the deed, the second is in ejectment to recover possession of the land. In the first count it is alleged that the land sued for was the homestead of Alexander Lieber, and that the plaintiff did not join in the deed, and further, that the deed was without consideration and made to defraud the plaintiff of her interest in the land. There were two tracts of land, one contained eighty acres, on which was the dwelling of Lieber; the other tract was forty acres of woodland not adjoining the eighty-acre tract.

There is no question but what the plaintiff and Alexander Lieber were married in St. Joseph, Missouri, in 1857, and lived in this State several years together as husband and wife, and that there were four children of the marriage. And there is no question but that she was his lawful wife up to the time of his death, unless a decree of divorce which he obtained in Illinois in 1868 was valid. That decree the plaintiff asserts was invalid because she says that the court which pronounced it had not jurisdiction of the parties. The plaintiff contends that by false representation the Illinois court was imposed on and was induced by the fraud of the plaintiff's husband to entertain jurisdiction of his bill for divorce. The main questions that we now have to consider are, Is that decree. open to assault in this case? If so, do the facts as shown by the evidence warrant the decree rendered by the trial court in this case?

The evidence on the part of the plaintiff, which was practically undisputed, was to the following effect:

Plaintiff and Alexander Lieber were married at St. Joseph, Missouri, in 1857, and moved to Shelby

county, in this State, where they lived as husband and wife until 1865; there were four children born to them. During the time they resided in Shelby county intimate relations grew up between Lieber and the defendant Elizabeth, who was then an unmarried woman. Her name was Elizabeth Dietz. Their association became a subject of talk in the community and one of his friends, a witness in this case, spoke to him about it, told him people were talking about mobbing him, and advised him to quit the association or else leave the country. Shortly after that, in the latter part of 1865, the young woman left the town where they were living and a few weeks thereafter Lieber sold out the most of his belongings and loaded the rest, together with his wife and children, into a wagon and started on a journey, saying he was going to move to Ohio to live. He went to Quincy, Illinois, and on arriving there he left his wife and children at a boarding-house for the night, saying he would return for them the next morning. He did return the next morning and told his wife that he would take the children to a store to buy shoes for them and some clothes; she asked to go with them but he refused, saying that he would return to her with the children in a half hour. He went away, leaving his wife alone at the boarding-house, and after walking a short distance along the street he turned into an alley where stood his wagon and horses hitched up ready to go, and in the wagon was the young woman Elizabeth Dietz. He put his children in the wagon, giving the youngest into the arms of Elizabeth, and started on his journey. His wife never saw him or heard from him or her children for many years afterwards. During the first day of the journey he told the children they should call the young woman mother; before that they had called her Lizzie. He wandered for some time through parts of Illinois, and finally crossed the river and landed at Alexandria, Missouri, where he camped with his female companion

and his children for a while, and left them there until
he went across the river to Warsaw, Illinois, where he
rented a house, into which he moved with her and they
wintered there. In the spring they moved out to a
farm, and lived there two or three years; while there a
child was born to them. After two or three years in
Illinois Lieber came with his companion and his child-
ren back to Missouri, and he purchased a house in
Perry, Ralls county, where he took up his residence.
After a while he began wandering again, taking defend-
ant and his children with him. He went to Greenville,
Tennessee, then he came back up the river to Burling-
ton, Iowa, and after remaining there about six weeks
he went to New Boston, Mercer county, Illinois, where,
within a few days after his arrival, he instituted suit
for divorce.

The petition for divorce was filed July 28, 1868;
the ground alleged was desertion for a period of two
years; accompanying the petition was an affidavit of
Lieber that his wife was a non-resident of Illinois; on
that affidavit an order of publication was issued by
the clerk of the court; proof of publication filed Sep-
tember 7, 1868; the wife not appearing the cause was
heard ex parte and decree of divorce granted October
9, 1868. After the divorce Lieber, with the defendant
and his children, immediately returned to Ralls county,
Missouri, where, on the 25th day of October, 1868, he
and Elizabeth Dietz were married.

When the plaintiff in the suit at bar was aban-
doned by her husband at Quincy, Illinois, she went to
Springfield, Illinois, where she lived twenty years or
more, until one of her sons, Edwin, found her and
brought her to Missouri. About two years before the
death of Lieber the plaintiff came to Hickory county
to live with her son Ben, who lived about a quarter of a
mile from where Lieber and defendant lived. Plain-
tiff never had any communication with them. At
that time Ben was not on friendly terms with his

father, they did not speak. This unfriendly condition had existed about four years before Lieber's death.

Lieber acquired the land in suit by three several purchases, 1883, 1885, and 1891. Shortly after plaintiff came into the neighborhood Lieber made a deed conveying the land to defendant.

The defendant, though present in court, did not testify. The only evidence introduced on her side was a transcript of the record of the Illinois court granting the divorce, and certain statutes of Illinois and a clause of its Constitution, and also a certificate of the marriage of Lieber and the defendant in Ralls county, October 25, 1868, and evidence as to the value of the land. The record of the Illinois court showed that the only testimony offered to sustain the charge of desertion in the petition was that of Lieber himself. Two witnesses, one of them his attorney, testified that he was worthy of belief. How long either one of them had known him was not stated.

The decree in the case at bar was in favor of the plaintiff, finding that the land in suit was the homestead of Lieber up to the time of his death, that the plaintiff had not joined in the deed by which Lieber had attempted to convey it to the defendant, that the decree of divorce, in so far as it affected the plaintiff's right to this land, was set at naught, and the deed to the defendant cancelled, and that the plaintiff was entitled to homestead and dower in the land. The finding was for the plaintiff on the ejectment count also, and the judgment was that she recover possession with $133 mesne profits, and $13 a month rental until possession given. Defendant appeals.

I. The first question in this case is, can the validity of the divorce decree be questioned in a suit of this kind and for the purpose of this suit? This is not a direct attack on the decree to annul it, it is a collateral attack in which the plaintiff says to the de-

fendant, You have no right to use that decree to deprive me of my lawful interest in this land. The judgment in this case does not declare the defendant's marriage illegal or bastardize her children, but it does say in effect that under the circumstances in which that divorce was obtained, whereof it appears that the defendant had full knowledge, and in the wrong of which she participated, a court of equity will not allow her to use it to defeat the plaintiff in her just right to this land. We do not mean to say that judgment of a court of a sister State, which is fair on the face of its record, is open to a collateral attack by a showing that the testimony on which it was founded was false, or that the true facts were not brought out in the trial. But when a court has been misled by a false statement of jurisdictional facts to take jurisdiction of a case and renders judgment on false evidence to the injury of a defendant who was not present and who had no notice of the suit, such a judgment is not only liable to a direct attack, but also sometimes to a collateral attack; that is to say, if it be a foreign judgment, though fair on its face and reciting the necessary jurisdictional facts, the party confronted with it may show that the court that rendered it did not have jurisdiction of it, and that may be shown by oral testimony.

There are two ways by which a court may obtain jurisdiction to adjudge the rights of the parties; one is in personal actions by service of process on the defendant, the other is in what are called actions *in rem,* where the court being in possession of the *res* gives the defendant notice by publication. The notice by publication is merely constructive and is often, if not usually, no notice at all; but when it is given in the way prescribed by law it is conclusive and the party will not be heard to say he did not receive it. This constructive notice is resorted to by the courts and justified by the law only because in that class of cases

it is necessary. But it is very easy to perceive how easily the law authorizing constructive notice may be abused and fraud committed. Suits for divorce are classed as proceedings *in rem*, and perhaps in no class of cases is the law which allows notice by publication more frequently abused and more cruel frauds perpetrated. It is so easy for a man who schemes to defraud his wife in such case to go to a distant State and file his suit and publish a notice in a newpaper that he knows neither she nor any of her friends will ever see, that the law almost seems as if it were designed to invite such fraudulent abuse of the courts. The law which classes suits for divorce as actions *in rem*, itself seems to resort somewhat to fiction for its reason for doing so; it calls the marriage condition a *res* over which the court acquires jurisdiction by the appearance of the complaining party and being so in possession of the *res* it resorts to a publication and then on proof of publication the court says in an interlocutory decree that the defendant, although duly notified comes not, therefore the cause will be heard ex parte, and so the plaintiff has it all his own way. If in after years the wife learns of the wrong that has been done her, and comes into a court of her own State and asks that the wrong be made right, if she is to be told that the law is such that there is no help for her, there would be little respect for the law. But such is not the law. If a party has been brought fairly within the jurisdiction of a court and has either neglected to answer or having been heard has had the judgment rendered against him, he has no right afterwards to litigate the matter again; and in that respect the judgment of another State is entitled in the courts in this State to equal respect with a judgment in this State, but there is this difference between a foreign and a domestic judgment, one who is sued on a foreign judgment may always show, if he

can, that the court that rendered the judgment did not have jurisdiction of him.

In Marx v. Fore, 51 Mo. 69, defendant was sued for a judgment obtained against him in another State; the judgment recited on its face that the defendant appeared by attorney and filed a plea; the defendant answered that he had not been served with process, had no notice of the suit and had not authorized anyone to appear for him; the trial court struck out that part of his answer and rendered judgment against him on the foreign judgment. This court held that to be error and reversed the judgment for that reason. This court per BLISS, J., said: "The rule is they [judgments of other States] are to be just as conclusive as domestic judgments, *with this exception,* they are open to inquiry as to the jurisdiction and notice to the defendant." In the opinion in that case quotation is made from the opinion in Starbuck v. Murray, 5 Wend. 156, which was a suit on a judgment of another State, wherein it is said: "No man is to be condemned without the opportunity of making a defense, or to have his property taken from him by a judicial sentence without the privilege of showing, if he can, the claim against him to be unfounded." In that case also it was stated on the face of the judgment sued on that the defendant had appeared, and it was insisted that that record imported absolute verity, but the judge speaking for the court said: "If the defendant did not have proper notice and did not appear to the original action, all the State courts, with one exception, agree in the opinion that the paper introduced as to him is no record; but if he cannot show, even against the pretended record, that fact, on the alleged ground of the uncontrovertible verity of the record, he is deprived of his defense by a process of reasoning that to my mind is little less than sophistry. The plaintiffs in effect declare to the defendant the paper declared on is a record because it says you

appeared, and you appeared because the paper is a record. This is reasoning in a circle. The appearance makes the record uncontrollable verity and the record makes the appearance an unimpeachable fact. . . . Unless a court has jurisdiction, it can never make a record which imports uncontrollable verity to the party over whom it has usurped jurisdiction, and he ought not, therefore, to be estopped by any allegation in that record, from proving any fact that goes to establish the truth of a plea alleging a want of jurisdiction.'' The opinion in that case was referred to with approval and much of it was quoted in Harris v. Hardeman, 55 U. S. 334, when the same doctrine concerning the validity of a judgment rendered in another State was declared. The same doctrine was also declared by the Supreme Court of Iowa in Lawrence v. Nelson, 131 Iowa, 277, in which the facts are very much like those in the case at bar. That case is also reported in 57 L. R. A. 583, where there is a learned note by the editor in which many authorities are examined. In the case of Haddock v. Haddock, 201 U. S. 562, which was a case calling in question a divorce decree rendered in one State and attempted to be enforced in the court of another, the court at page 573 said: ''It must always be borne in mind that it is elementary that where the full faith and credit clause of the Constitution is invoked to compel the enforcement in one State of a decree rendered in another, the question of the jurisdiction of the court by which the decree was rendered is open to inquiry.'' That is now the established doctrine.

As we have already said a suit for divorce in which only one party appears and the other is not served with process is classed as a proceeding *in rem*. It is so classed and so treated not because it is really a proceeding *in rem,* but resort to that fiction is necessary because, unless it be so designated and so

treated, the courts could do nothing with it. A highly
esteemed text-writer, referring to this subject and the
constructive notice allowed by statute, says: "And
in international law necessity, which is a force om-
nipotent in all legal affairs, compels the acceptance
of the notice as sufficient; because no higher grade of
notice to absent defendants is possible, and unless this
rule is adopted, the State of the plaintiff has no means
of determining the status of its citizen." [2 Bishop
on Marriage, Divorce & Separation, sec. 140.] The
right of the State to determine that status is stated
by the same learned author in section 138 thus: "The
right of any State to declare the status of its own
domiciled subject is absolute. . . . And both in
reason and by the highest judicial authority in our
country, this doctrine applies as well to a husband or
wife whose married partner is permanently abiding
in another State, as to both parties when living to-
gether in the same State." The doctrine there stated
is that the State has the right to declare the status of
its own resident, and that it may do, although the mar-
ital partner is absent. It is the status of the person
residing within its limits that the State has jurisdic-
tion of. But if the party seeking the divorce is not
a resident, that State has not jurisdiction of his status,
and he cannot make the false statement of residence
there the lawful foundation for constructive notice to
his absent wife. Returning again to the subject of
the classification of such suits as proceedings *in rem*,
the text-writer above cited, quoting the language of
Chief Justice FULLER, says: "That only is a pro-
ceeding *in rem*, in which the process is to be served on
the thing itself." Then the author goes on to say
there are proceedings that are *quasi in rem*, or partly
*in rem* and partly *in personam*; that a divorce pro-
ceeding partakes of both these characters, the one re-
lating to the status, the other to the property rights
of the parties. [2 Bishop on Marriage, Divorce &

Separation, sec. 20-3.]   As a proceeding *in rem* the court may decree a divorce on the theory that it is in possession of the status, the *res,* but it cannot decree alimony because it has not jurisdiction of the person. In a suit by attachment the court must be in possession of the property before it can resort to constructive notice to the defendant, so in a divorce suit the court must be in possession of the marital status before it can call in the absent defendant by publication in a newspaper.   Can the court be said to be in possession of the marital status on the appearance of the husband only, when he is not a resident of the State, or has not resided there long enough to authorize a court of that State to entertain jurisdiction of his suit? And if not can he by a false statement give the court jurisdiction?

In Haddock v. Haddock above referred to, the marriage had occurred in New York where the parties then lived, the husband moved to Connecticut, leaving his wife in New York, and, after acquiring a legal residence in Connecticut, instituted a suit there for divorce, giving constructive notice to his wife by publication.   He obtained the divorce, and the question of its validity, as it affected the wife in New York, came up in a court in New York.   The Supreme Court of the United States, to which the case finally went, held that while the decree of the Connecticut court was valid in that State, it was not valid as against the wife in New York.   The court in that case drew a distinction between the personal domicile of one of the parties and the matrimonial domicile of both, holding that the domicile of only one was not the matrimonial domicile, and therefore not sufficient to give the court jurisdiction of the marital status, that is of the *res,* to the extent of disposing of the marital rights of the absent party, although it would be sufficient as to the plaintiff in the case.

But even if we should say that the residence of one of the parties was sufficient to give the court jurisdiction of the marriage status, it would not render the Illinois divorce in this case valid as against this plaintiff, because her husband was not a bona-fide resident of Illinois at the time the decree was granted.

The statute of Illinois provides that no person shall be entitled to a divorce who has not resided in the State one whole year previous to filing his suit, unless it be for injury committed in that State, which was not charged in the petition in that case. When Lieber first deserted his wife, after wandering around for awhile, he located at or near Warsaw, Illinois, and remained there long enough to make two or three crops, and then he returned to Missouri, traded some personal property he had for a house and some lots at Perry, in Ralls county, and took up his residence there; then, after he had been warned that people were talking about his living with defendant, he left Ralls county and went to New Boston, Mercer county, Illinois, in which county he at once instituted this suit for divorce, and as soon as he obtained the decree he and the defendant and his children returned to Ralls county, and there he and defendant were married. He did not remain in Illinois longer than from July to October, 1868, and evidently went there only for the purpose of obtaining this divorce. We are satisfied from the evidence that Lieber did not become a resident of Illinois at that time. Whatever may be said of his sojourn at or near Warsaw, when he left there and came to Missouri he took up his residence here, and only left it long enough to go to Illinois and get a divorce. He induced the Illinois court to take jurisdiction of his case by falsely stating that he was "then and had been for more than one year prior to the beginning of this suit, a bona-fide resident of the State of Illinois."

We hold that the divorce decree was invalid in so far as the plaintiff's right to the land in suit is concerned, and to this extent the divorce is held for naught.

II.  Plaintiff was sworn as a witness and asked to state when she and Lieber were married.  Defendant objected on the ground that Lieber being dead she was incompetent to testify to any fact except such as may have occurred after letters of administration on his estate were granted; the court overruled the objection and the defendant excepted.  The witness testified as to when and where she was married, also in reference to the trip to Quincy, Illinois, and her abandonment there.  If it should be conceded that she was incompetent to testify to the marriage, the error would be of no consequence, because there was other evidence of the marriage, and even the defendant's own proof, the record of the Illinois court, shows the marriage as of the same date and place stated by her. That fact was not in dispute.  When she was asked to state some conversation with her husband, the court sustained defendant's objection.  There was no error in permitting her to testify.

III.  Counsel for appellant comment on what they consider the unreliability of the plaintiff's evidence in relation to the desertion and the wanderings of Lieber until the divorce was obtained.  This comment is based on the fact that the two sons who gave the testimony were too young at the time to remember the facts.  At the date of the desertion in 1865 the younger of these two boys was about five years old, the elder about eight or nine, at the date of the divorce the younger was about eight and the elder eleven or twelve.  Doubtless the younger was too young to have any reliable independent recollection of the events that occurred in 1865, yet his recollection of what occurred in 1868 is not unreasonable.

But the boy who was eight or nine years old in 1865, and eleven or twelve in 1868, was old enough to remember those events which formed so important a part of his boyhood life. If these witnesses had undertaken to repeat conversations they then heard, the reliability of their recollection might well be questioned, but what intelligent boy from eight to twelve years of age cannot remember with vividness during the whole period of his after life such remarkable events as a part of his own history? Besides these boys were reared in the family of their father and the defendant, and they testified that they often heard them speaking of these events and of the duration of their stay in the various places. Listening to those conversations would bring back to their memories the events and impress them on their minds. And furthermore the defendant was in court and heard the testimony and yet she remained silent. We hold that the testimony was sufficient in quality and quantity to justify the trial judge in his findings of facts.

IV. The point is made by appellant that Lieber owned this land and held it as his homestead before the homestead law was so amended in 1895 as to deprive the husband of his right to sell it without his wife's joining him, and in support of that contention appellant refers to Gladney v. Sydnor, 172 Mo. 318.

Under the Homestead Law as it was before it was amended in 1895 (Laws 1895, p. 185) the husband had the right to sell or mortgage his homestead without his wife joining in the deed, unless she had made her claim of homestead and filed it in the office of the recorder of deeds (Sec. 5435, R. S. 1889), which in this case the plaintiff did not do. By the amendment of 1895 it was enacted: "The husband shall be debarred from and incapable of selling, mortgaging, or alienating the homestead in any manner whatever, and every such sale, mortgage or alienation is hereby declared

null and void." In the case of Gladney v. Sydnor, above mentioned, it was held that the amendment of 1895 did not apply to a homestead acquired by the husband before that amendment. Conceding that Lieber had the right to sell or mortgage the land embraced in the homestead, without his wife's joining in the deed, still, under the Homestead Law as it was when Lieber acquired the land, if he died without selling it, it would vest in his widow (there being no minor children) until her death. [Sec. 5439, R. S. 1889.] The question then arises, what does the law mean when it says the husband may sell or mortgage his homestead? It means he may sell or mortgage it in good faith, it does not mean that he may make a fraudulent sale for the purpose of depriving his widow of her right. Therefore, if the alleged sale by Lieber to the defendant was made for the fraudulent purpose of depriving the plaintiff of her right to the homestead, it was no sale at all. We have no doubt this alleged sale was made for that fraudulent purpose. Considering the history of this family as it is above stated, the wrong suffered by this woman, the oblivion into which she had apparently passed for so many years, when it was probably hoped that she had passed out of their lives forever, then her reappearance, and then, almost immediately thereafter the execution of this deed, we cannot but conclude that the deed was made to defraud the plaintiff. Plaintiff did not prove that no money passed as the consideration of the deed, that fact was probably beyond her ken, but she did prove the above mentioned circumstances and in the face of that proof the defendant sat in court and opened not her mouth. We hold that the deed was without lawful consideration and invalid as to this plaintiff.

V. It is said that the plaintiff has waited fifteen years or more after she knew of the divorce before

making complaint and she is now precluded by her laches. There is no such plea as this in the answer, but if there were it would not apply to the facts of this case. The object of this suit is only to recover the plaintiff's interest in this land; to do so it was not necessary that she should have sued her husband to annul the decree of divorce. Her right to the land did not accrue until the death of her husband; she brought suit within a few days after his death, and she brought it within about two years after the deed which she seeks to set aside was executed.

In my opinion there is no error in the record and the judgment ought to be affirmed. *Kennish, J.*, concurs in this opinion.

## DISSENTING OPINION.

KENNISH, J.—I concur in the dissenting opinion delivered by the Chief Justice in this case. In holding that the judgment should be affirmed, it is fully supported by competent evidence and well-established principles of law. I could well rest with a silent concurrence therein, were it not for the conviction that the controlling opinion, written since what is now a dissent, is so far reaching in its bearing upon the marital rights of married women, and, as appears to the writer, is, as to some of the propositions of law announced, based upon such unsound reasoning and upon such a misconception of the law, as to require that I give expression to my views.

The trial court had before it two claimants to the rights of widowhood in the estate of Alexander Lieber, deceased. Under the evidence one had been regularly married, had lived with her husband in lawful wedlock more than eight years, had borne him four children and, so far as the record discloses, was innocent

of offense against her marriage vows. The other came into the Lieber family, sustained improper and unlawful relations with the husband, disrupted the family circle, and deprived the wife not only of her husband, but of her children, one a babe in arms. The illicit intimacy thus formed, after having been maintained for about three years, during which time a child was born, was sought to be glazed over and legalized by a pretended divorce obtained in another State, without the knowledge of the lawful wife, from a court which assumed jurisdiction only on the false testimony of the husband, and followed by an alleged marriage. The wife, abandoned and left in ignorance of her husband and children for more than twenty years, came into court after her husband's death and asked recognition of her property-rights as his widow.

The foregoing is bird's-eye view, not unfairly condensed, of the facts before the trial court and upon which judgment was pronounced upholding the marital rights of the plaintiff, the first wife. That decree this court reverses, and directs judgment to be entered in favor of appellant.

In expressing my dissent from that judgment I shall take up the propositions of law announced in the opinion, in the order there discussed. And it should be said by way of preface to all that follows that the fact that the husband was a party to (and may have been the moving spirit in) the conspiracy against the lawful wife, makes the appellant none the less a party and equally responsible for all that was done in furtherance of the common design. That is but the statement of a truism of the law.

1. The first proposition decided is that the plaintiff was not a competent witness. The sole ground of objection to her competency was "for the reason that she, being one of the parties to the cause of action, and it appearing that the other party is dead, would be an incompetent witness under the statute, for any pur-

pose.'' The cause of action referred to in the objection is manifestly not the one then on trial, but the cause which resulted in the decree of divorce in the State of Illinois, and upon which appellant bases her title as widow. The statute referred to is section 6354, Revised Statutes 1909, which provides that ''in actions were one of the original parties to the contract or cause of action in issue and on trial is dead, or is shown to the court to be insane, the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him.'' etc. It should be observed that the fact that the plaintiff in this suit and the plaintiff in the divorce suit had sustained the relation of husband and wife is not material, as it does not affect the question of her competency thus raised. The objection is based solely upon the statute, as to the effect of the death of one of the parties to the ''cause of action in issue and on trial,'' and must be tested by the same rules of law as if the marriage relation had never existed.

The opinion of the court devotes much space to the citation of authorities in support of the unquestioned proposition of law, as stated therein, that ''when death or insanity has closed the lips of one of the parties to the contract, or cause of action, in issue and on trial, then the law should hold mute the tongue of the other.'' Assuming, without conceding, that the divorce case tried forty years before, in another State, comes within the language of the statute, it is nevertheless apparent that, even on that assumption, the court has clearly misapplied the authorities cited to the facts of this case, and has put that salutary rule of law to a use the very opposite of that intended. As to the material facts involved in the divorce suit, including the jurisdiction of the court, and upon which plaintiff testified, the other party's lips were not closed by death. He had testified as to those facts; his testimony

was embodied in the decree of divorce; was read in evidence in this case, and is a part of the record before us. In view of the well recognized principle of law that a party may attack, by extrinsic evidence, a foreign judgment, for the purpose of showing that the court which rendered it was without jurisdiction, it is obvious that the doctrine of the opinion in this case leads to the unreasonable result that, although the deceased had testified and furnished the only basis to uphold the jurisdiction of the court, which testimony was again introduced in the trial of this case for the same purpose, the mouth of the living witness should be closed as to the same jurisdictional facts. According to that theory, if one of the parties to a suit had given his deposition and died before trial, his deposition could be read in evidence, while the mouth of the other party would be closed by the statute. This law was never intended to effect such an unjust and unreasonable end. The recognized rule in such cases is that "if the deposition or testimony of the deceased person was taken before his death in regard to such transactions and is used in the trial, or is in court so that it can be used, then the opposite party becomes competent as to the matters embraced therein. [2 Elliott on Evidence, p. 49, sec. 737, and authorities cited.] Following this generally accepted rule, this court, in the case of Stone v. Hunt, 114 Mo. 66, decided, as stated in the first syllabus, that: "Where the testimony of one of the parties to a suit has been taken in the form of a deposition, or his testimony has been preserved by bill of exceptions, and such party has died, the living party may testify in his own behalf, and this too, whether the representative of the deceased does or does not produce and introduce the testimony of the deceased."

In addition to the foregoing, plaintiff's testimony, as clearly shown in the dissenting opinion by VALLIANT, C. J., was merely cumulative, and furnished no ground

for reversing the judgment, for the reason that, as presently shown, the decree is fully supported without it.

2. Was the chancellor warranted in adjudging the decree in the divorce case a nullity, so far as it affected the marital property-rights of the plaintiff?

The law upon this question is so thoroughly presented in the dissenting opinion of VALLIANT, C. J., that I shall not attempt a further discussion. As there shown, a judgment of another State may be attacked collaterally because void for want of jurisdiction in the court that rendered it. Under the law of collateral attack in such case, jurisdictional facts stand upon an entirely different footing from such facts as constitute plaintiff's cause of action and upon which the prayer for relief is based. This distinction seems to have been entirely overlooked in the majority opinion, which holds that there is no difference in that regard between foreign and domestic judgments. Fraud or even perjury, as to facts of the latter class, cannot be made the basis of a collateral attack in the case of either foreign or domestic judgments, while those which are jurisdictional may be inquired into in the case of foreign judgments. It was a jurisdictional fact under the law of Illinois that plaintiff had resided in that State one whole year previous to the filing of his petition in the divorce case. If he had not so resided in that State then the court, being deceived by his petition and testimony, was without jurisdiction and the decree of divorce, so far as its effect upon the plaintiff's property-rights was concerned, was void. Under the law thus stated the question arises, was the testimony sufficient to warrant the finding that Alexander Lieber was not a resident of Illinois one whole year before the filing of his petition for divorce?

Ed Lieber was born in 1858 or 1859 (the exact year of the two being uncertain), and his brother Ben in 1860, so that the year the divorce was obtained one

of them was either nine or ten years of age and the other eight. They both testified with much detail of fact that their father and family had moved from Warsaw, Illinois, in the early spring of 1868, across the Mississippi river into Missouri, and had located at Perry, in Ralls county. There he traded his team for four lots, on one of which there was a cabin in which he and his family lived for some time until a report was received which caused Lieber to go into hiding. They then sold their furniture, but not their home, and went to Hannibal, Missouri, where they took passage by boat to Greenville, Tennessee, and from there back up the river to Burlington, Iowa, where they rented rooms and lived for six or eight weeks. From Burlington they went to New Boston, Illinois (not in the county in which they had previously resided), and remained for about three months, during which time the decree of divorce was obtained. While in New Boston, Waterman, Lieber's attorney in the divorce case, let them have two rooms in his residence, in which they lived using cracker boxes for chairs and dry-goods boxes for a table. The decree of divorce was entered August 10, 1868, and on the 25th day of the same month the family was back at Perry, at which time and place Lieber and appellant were married, the certificate reciting that Lieber was a resident of Ralls county, Missouri. They moved into the property which they had left a few months before and for a time continued to resided there. The facts as to the family coming to Perry, trading for the property and living there awhile, after which they moved away and returned in less than a year and resumed living in the same property, were all testified to by a Mrs. Taylor who lived near them at the time. If these witnesses were testifying falsely or were mistaken, it would not seem a matter of great difficulty to have shown that fact. According to their testimony appellant was with them in all their wanderings. She was pres-

ent in the courtroom and heard them testify. She was a competent witness as to what occurred, at least up to the time of her marriage, and the fact of her silence under these circumstances is a strong and significant corroboration of the testimony of the sons and Mrs. Taylor. There is no evidence to the contrary except the unsupported testimony of Lieber in the ex parte hearing of the divorce case, and in view of the uncontradicted testimony of old men, who were neighbors at the time, as to his relations with appellant and his treatment of his wife, his uncorroborated testimony in a proceeding to put his wife away, in her absence and without her knowledge, considering what transpired before and immediately after, should certainly be of little probative force in a court of equity. These facts and circumstances clearly show that Lieber had ceased to be a resident of Illinois in 1868 when he came to this State, bought property here and resided therein, and that his return to Illinois and sojourn there, with cracker-box furnishings, long enough only to procure a divorce, was not in good faith and did not make him a resident of that State. It follows from this view that the chancellor was fully warranted in holding that the Illinois court was without jurisdiction to render the decree of divorce and that such decree did not have the effect of depriving respondent of her marital rights in the property of her deceased husband.

3. In the third proposition discussed in the controlling opinion it is gravely stated as the law that the plaintiff was without redress because the judgment in the divorce case could not be attacked collaterally, and as it was "a judgment *in rem*" and one of the parties was dead and the judgment *in rem* "would not descend to his heirs nor would it pass into the hands of his executor or administrator," it could not be attacked directly. From which it necessarily follows that as it could not be attacked either directly or in-

directly—it could not be attacked at all. Such doctrine throws away the maxims of equity and of the common law, and the right to a hearing, to a day in court, and the remedy that the law affords for every wrong, become but mere fictions and impossible of enforcement. Under that theory if a guilty husband could succeed in eluding his family and in the obscurity of another State by falsehood secure a divorce, give his property to a paramour and die, the family would be defrauded of their patrimony because forsooth, under the full faith-and-credit clause of the Federal Constitution, the fraudulent decree of divorce could not be attacked collaterally, and, because it was a "judgment *in rem*" and one of the parties was dead, it could not be attacked directly. Is the law so helpless as that? Is the arm of a court of equity to be paralyzed by such quibbles?

4. The domestic tragedy shown by this record opens with a wedding in a cathedral in St. Joseph, then a pioneer town of this State. The young couple, in accordance with the vicissitudes of the early settlers, lived in different places and, so far as the record discloses, without a note of discord until four children were born and there was a family circle of six. Then a strange woman came upon the scene. The wife and mother murmured to the neighbors, who had observed the misconduct independently of her complaint. The moral sense of the community revolted and the husband was warned that he must change his course or leave. He sold his growing crop, loaded his wife and children in wagon, and told them they were setting out for Ohio. As they journeyed towards Quincy, the wife, doubtless rejoicing at the release from an intolerable situation, little knew that a few days before her faithless husband had been seen travelling over the same road with the woman who had come across her pathway, and who was then in the town ahead, waiting to take the position of wife in the front seat of the Lieber

Lieber v. Lieber.

wagon and household and hold it until death.  The treacherous plot was carried out, and the wife, left in a strange place, found herself disillusioned and bereft of husband and children.  Thus abandoned she was left not with the hope which, however faint, keeps a light in the window, but to spend a life in sorrow and mourning "even as others which have no hope."  Finally, an old woman, she is taken to live with her son in sight of the home of her husband and the woman who had wrecked her life.  There she lived but a short time until her husband died.  But she refused to look upon him in life or in death, or to assert her property-rights while he lived.  Should the latter fact be counted against her as is done by the judgment of this court?  The business view of life that would apply in such case the same requirement of vigilance in the assertion of legal rights as in the case of loss of property, overlooks the finer sensibilities of womanhood which would cause plaintiff to shrink from a confrontation in public of her husband standing by the woman who had wrought her undoing.  After his death she comes to a court of equity and with the badge of innocence willingly tells her story.  The other woman, at last before the bar of justice, in keeping with the proprieties of the occasion, stands mute.  The experienced chancellor heard the case, saw before him the witnesses and parties, and rendered a judgment recognizing the plaintiff's property-rights as the widow of her deceased husband.  But this belated justice was not to last, for that decree is now reversed, and this sad story of the Lieber family closes in a court of equity, with the triumph of the wrongdoer and with a denial of redress to the injured and innocent wife and mother.

*Valliant, C. J.,* concurs in this opinion.